MARTHA S. PLUMER *vs.* MATTHEW LUCE, JUNIOR, & another.

Suffolk.          October 7, 1941. — February 14, 1942.

Present: FIELD, C.J., DONAHUE, QUA, COX, & RONAN, JJ.

*Fiduciary. Fraud. Contract,* Validity. *Equity Pleading and Practice,* Findings by judge.

Upon a voluntary report by the trial judge "of all material facts upon which the order for decree is based" in a suit in equity, no further findings were to be implied.

In a suit in equity to rescind a certain transaction between the defendant and the plaintiff, a widow, a finding of a fiduciary relation between the parties was not justified where the plaintiff's testimony showed that she was not without business intelligence and that she had been accustomed generally to make the final decisions in matters respecting her securities, although previous to such transaction the defendant had procured her account for a stockbroking firm of which he was an

employee and with which she had dealt for some time, and she had confidence in his honesty and ability.

A contract in writing between a defendant and a woman of considerable business intelligence, toward whom he was not a fiduciary, signed by her under a recital that she understood its terms "fully" and in signing did not rely "upon anything not expressed therein," and plainly stating that a transaction whereby he was to receive "moneys" from her and in fact did receive the proceeds of sales of securities of hers, was a loan to him to be evidenced by a note, which he gave her and which she subsequently in writing "ratified and confirmed" as such, could not be avoided by her, nor could the defendant be held accountable for such proceeds, which he had used for his own benefit, merely because negotiations with her a short time before the contract was signed looked toward an arrangement whereby he would take her securities and deal with them on the market for her account, paying her interest periodically, and she might have thought that such was the nature of the transaction finally effected.

BILL IN EQUITY, filed in the Superior Court on September 14, 1939, and afterwards amended.

The suit was heard by *Morton,* J., and final decree was entered by order of *Broadhurst,* J.

*J. C. Johnston,* for the defendants.

*E. C. Park,* (*C. C. Worth* with him,) for the plaintiff.

Cox, J.   The plaintiff in this bill in equity seeks to rescind a transaction with the defendant Luce, hereinafter referred to as the defendant, and to have him account for property that he received from her in that transaction on the ground that she was fraudulently induced by him to enter into it.   She prays, among other things, that the "document," hereinafter referred to, signed by her on January 13, 1939, be decreed to be null and void.   The evidence is reported, and the trial judge made a voluntary report of material facts.   The defendant appealed from the final decree by which the note, hereinafter referred to, and the "contract or other arrangement between the parties arising from the letter of January 12, 1939 are declared void," and other relief was given to the plaintiff.   In the circumstances, it is for this court to review fact as well as law, but weight must be given to the judge's findings, and one question to be decided is whether it can rightly be said that the findings made by the judge who saw the witnesses and heard them testify are plainly wrong.   *Boston* v. *San-*

*tosuosso,* 307 Mass. 302, 331, 332, and cases cited. The
report is "of all material facts upon which the order for
decree is based." In the circumstances, there is no room
for any implication of findings beyond those contained in
the judge's report. *Birnbaum* v. *Pamoukis,* 301 Mass. 559,
561–562.

The report is as follows: "This is a bill in equity seeking
the cancellation of a note given by the defendant to the
plaintiff and an accounting between the parties, arising
out of transactions hereinafter referred to. The plaintiff
is a widow, her husband having died in 1933 and leaving
her with considerable personal property consisting of securi-
ties, and from 1933 on the plaintiff did considerable business
with brokers in the purchase and sales of securities. The
defendant was formerly a customers' man, so-called, for
J. H. Goddard & Company, dealer and broker in invest-
ment securities, and by some way, which did not appear in
evidence, the defendant knew of the plaintiff and called
upon her in March of 1937, secured her confidence and was
allowed by her to act as broker in various transactions
relative to the securities then owned by the plaintiff. These
dealings and transactions went on until the latter part of
1938, when the defendant suggested to the plaintiff that he
could deal more efficiently with the securities and could
take advantage of a possible rise in the market value
thereof if the same were placed in his name so that he
could deal with them from time to time without conferring
with the plaintiff. He first suggested that a corporation
be formed to handle the business relative to the securities;
this the plaintiff refused to do, but did finally agree to
turn over to the defendant such securities as were then
available having approximately a market value of $17,000.
The defendant suggested that the arrangements should be
reduced to writing, and to that end he consulted counsel
who drafted a letter addressed to the plaintiff and signed
by the defendant, a copy of which appears in the bill and
bears a date of January 12, 1939. The original was sent
to the plaintiff by mail and on the next day, January 13,
1939, she signed the postscript thereto setting forth that she

had read the letter and understood fully its terms. On the same day she turned over to the defendant securities at an approximate market value of $17,000.00. After the securi-- ties were delivered to the defendant he sold the same within two or three days through the brokerage office of J. P. Marto & Company, checks for the proceeds thereof being made out by J. P. Marto & Company in the name of the plaintiff. These checks were delivered to the plaintiff by the defendant and she then endorsed the same so that the defendant could cash them, the proceeds of the sale of the securities amounted to $16,401. On February 1, 1939 the defendant delivered to the plaintiff his unsecured note of that date in the principal sum of $16,401, providing for the payment of principal in three years with interest at the rate of six per cent. The defendant then traded therein on margin with Spencer Trask & Company, investment brokers in Boston, and lost in such transactions, $2,877. Of the proceeds of the securities there was approximately $1,000 on a checking account in a bank, which is under attachment in this suit. Of the balance of the proceeds of the securities the defendant has spent the entire amount thereof in living expenses. If material, I find that the plaintiff, notwithstanding her acceptance of the letter of January 12th by signing the postscript thereto, did not understand nor intend to deliver the securities referred to to the defendant to do with as he pleased. She understood the arrangement was to the effect that the defendant would take the securities, deal with them on the market, confer with her monthly as to the status of her account, pay her interest monthly at the rate of six per cent and, at the end of three years upon her demand, would return such securities to her as the defendant had purchased for her account. I make this finding in view of that sentence in the letter, as follows: 'It is my intention, as you know, to use the monies received from you in return for my note in the purchase and sale of stock.' The defendant paid the plaintiff interest monthly at the rate of six per cent; pay- ments of interest since the suit was brought were made by check and have not been cashed by the plaintiff as the

account upon which the checks were drawn was attached in this action. I find that, at the time the arrangement was made between the defendant and plaintiff, as above set forth, the defendant intended to use the proceeds of the securities for his own benefit. I find that the plaintiff was a woman of little or no business experience notwithstanding the fact that for two or three years prior to her dealings with the defendant she had her brokers act for her in the purchase and sale of securities. It was obvious that she did not know the difference between the proceeds of a coupon and a dividend, and in general had to rely upon the advice of others in all business matters. This the defendant well knew, and he also knew that she had great confidence in his honesty, business ability, his skill and experience in investments, that she trusted him, that he had influence with her in advising her as to investments, that he was friendly to her and interested in helping her. He expected and invited her to have absolute confidence in him and gave her to understand that she might safely apply to him for advice and counsel as to investments. The defendant also knew that the plaintiff, in relying upon him as she did, as hereinbefore set forth, sought no independent legal or other advice from another. These facts, together with the further fact that at the time the plaintiff signed the postscript to the letter of January 12th the defendant had the secret intention of converting the securities turned over to him or the proceeds thereof to his own use, make applicable to the situation thus disclosed the principle set forth in *Israel* v. *Sommer*, 292 Mass. 113, and in consequence thereof a decree may be entered declaring void the note given by the defendant to the plaintiff, the contract or other arrangement between the parties arising from the letter of January 12, 1939, declaring that the proceeds of the securities turned over to the defendant by the plaintiff are held by him in trust for her, and determining that the indebtedness of the defendant to the plaintiff is $17,385.07."

The "letter" or "document," hereinbefore referred to, is as follows: "Boston, Massachusetts   January 12, 1939   Mrs.

Martha S. Plumer  25 Sargent Street  Melrose Highlands, Massachusetts  Dear Madam: Before you consent to accept my note for three years in consideration of the loan of $17,000 I want to be sure that you fully understand the implications of the transaction and for this reason it seems wise to state them clearly in a letter so that you may be able to weigh the matter impartially before you commit yourself to the transaction. It is my intention, as you know, to use the moneys received from you in return for my note in the purchase and sale of stock. You must understand, however, that in the event that you decide to accept my note I shall be under no obligation so to do and if I do you will have no claim upon the stock itself but your sole claim will be against me personally for the repayment of the money which you loan me. In other words this transaction amounts to nothing more than a loan by you to me and my obligation to you created by this note will be solely a contractual relation. I want it further understood in the event that you decide to make me the loan that you are relying upon no representations other than are herein stated. Take time, therefore, to consider the matter and to take advice from others. If you decide to do it please sign the postscript [*sic*] herewith and return the letter to me, keeping for your own files the signed copy which I am enclosing herewith. Very truly yours, Matthew Luce Jr  Melrose, January 13, 1939. I have read the foregoing letter and understand fully the terms thereof and I affix my signature hereto without reliance upon anything not expressed in the letter. Martha S. Plumer."

Subject to the defendant's exception evidence was admitted as to the plaintiff's understanding of the agreement. But in any event, the plaintiff's understanding of whatever agreement was made is not material in the absence of a fiduciary relationship. *Costello* v. *Hayes*, 249 Mass. 349, 352. *Darling-Singer Lumber Co.* v. *Commonwealth*, 290 Mass. 488, 492.

The material findings are: (1) that at the time the "arrangement" was made, "as above set forth," the defendant intended to use the proceeds of the securities for

his own benefit; (2) the defendant was a fiduciary. It is not entirely clear from the findings what the "arrangement" is "as above set forth." The judge found that the plaintiff finally agreed to turn over her securities to the defendant after he had suggested that he could deal more efficiently with them if they were placed in his name so that he could deal with them from time to time without conferring with the plaintiff, and that the plaintiff signed the letter in question. The "contract or other arrangement . . . arising from the letter of January 12, 1939" is ordered to be declared "void," as well as the note. We are of opinion that the judge, as did the parties, treated the letter in question as the contract. In so far as the material findings are concerned, we think they are to be considered as amounting to this: (1) the letter constituted the contract; (2) the defendant was a fiduciary; (3) the defendant had a secret intention which he was in duty bound to disclose.

1. We are of opinion that the finding of a fiduciary relationship is wrong. Apparently it does not take into account the testimony of the plaintiff, by which she is bound, that when the defendant first came to see her in 1937 she gave him a list of her securities, and that thereafter she received a "Memorandum" typed upon sheets headed with the name "J. H. Goddard & Co. Investment Securities," brokers by whom she knew the defendant was employed. This memorandum appears to contain an analysis of her securities, together with suggested changes by way of sales and purchases. The plaintiff testified that after several conversations with the defendant she gave him some of her savings bank books and securities, and it appears that from time to time Goddard & Company bought and sold securities for her account. She testified that she knew she was dealing with Goddard & Company; that she knew it was their advice she was receiving; that she knew the defendant was employed by, and knew, or presumed, that he was receiving pay from Goddard & Company for the services he rendered in securing her account, and that "that was the relation that existed between . . . [them] down until about 1939"; that as to the analysis of her securities that she

received from Goddard & Company, she knew that this was their written opinion and advice and not the defendant's personal advice. She received receipts from Goddard & Company for securities she turned over. Her account with that company is balanced as of November 29, 1937. The transactions that are shown thereafter, apart from a delivery of some shares that were exchanged for new stock of the same company in December, 1937, commence on August 24, 1938, and end on December 6, 1938. They consist of the receipt of four blocks of stock from the plaintiff which apparently Goddard & Company sold for her account, and for which four checks were given to her finally to balance the account. We think it follows that the relation between Goddard & Company and the plaintiff was that of debtor and creditor, and not a fiduciary one, and there are no special circumstances disclosed that permit a contrary conclusion. *Furber* v. *Dane*, 204 Mass. 412, 416. In the circumstances, the finding of the judge that the plaintiff allowed the defendant to act as her broker is not warranted. There is nothing in the record to indicate that either Goddard & Company or the defendant, so long as the plaintiff was dealing with that company, did, or refrained from doing, anything of which the plaintiff can complain, and at the trial her counsel expressly disavowed making any contention with regard to the defendant's responsibility for the securities or money that was turned over to him in the spring of 1937.

In any event, the plaintiff's relations with Goddard & Company finally came to an end, but not before she had opened two other accounts with brokers, with one of whom she had an account at the time of the trial. She went to see one of these brokers and talked things over with him. He suggested a few changes in her securities to which she was agreeable, and in every instance where securities were bought or sold by these two brokers, she personally gave the order. It is true that it could have been found that the defendant, when he took the securities to the broker for sale after the letter of January 12, 1939, was signed, was asked as to his capacity, and that he said he acted in a

"fiduciary capacity sort of"; that he did a lot of business with the plaintiff, and had done a lot of business with her over a period of years. We are of opinion, however, that this does not control the other evidence in the case that shows a business relationship between Goddard & Company and the plaintiff while the defendant was its employee and thereafter. See *Tully* v. *Mandell,* 269 Mass. 307, 309; *Hyland* v. *Hyland,* 278 Mass. 112, 119, 120.

In the fall of 1938 conversations began between the plaintiff and defendant relative to the latter having the plaintiff's securities in his name. There were several conversations and the plaintiff "was just thinking it over." Eventually she "decided he could look after it better than . . . [she], and said . . . [she] would let him have the money." It is to be observed that in this she did not refer to letting the defendant have the securities. From the inception of these conversations down to the time when the letter was signed, there was nothing in them relating in any way to any transactions then in hand. On the contrary, they were with reference to some sort of any agreement that the defendant was suggesting. The defendant apparently had stepped out of his position as an employee of Goddard & Company, at least in so far as his relation with the plaintiff was concerned, and it is apparent that he was attempting to accomplish something for himself. It is true that during this period the plaintiff told him that she was not a business woman; that she trusted him to do the best he could for her and thought he was going to. She rejected his suggestion that a corporation be formed, although he told her it was all to benefit, to help, her. She gave the matter thought and eventually decided he "could look after it better than . . . [she]" and told him that she would let him have the "money."

The judge found that the plaintiff was a woman of little or no "business experience notwithstanding the fact that for two or three years prior to her dealings with the defendant she had her brokers act for her in the purchase and sale of securities." Just what is meant by the words "business experience" does not appear, but the evidence discloses

that the plaintiff became the owner of a house at the time of the death of her husband, from whom she also inherited between $60,000 and $70,000, all of which consisted of stocks and bank accounts; that she had some money of her own; "Not much." Her securities were rearranged upon the advice of a broker shortly after her husband's death, and thereafter it appears that there was a considerable number of stock transactions in regard to which she received advice and in almost all of which instances she reserved the right to make, and made, the final decision. The judge also found that it was obvious that the plaintiff did not know the difference between the proceeds of a coupon and a dividend, and, in general, had to rely upon the advice of others in all business matters. She did know that a coupon was something cut from "whatever it is — I don't know what it is; that is a bond, isn't it." She knew that a dividend is "what you make in stocks, if the company pays or if they make money, they pay you a dividend"; that dividends are paid out of earnings of a company and that they represent earnings. It is true that she testified that she did not know that the interest derived from bonds comes ahead of dividends. It appears that among the securities turned over by her to Goddard & Company there were at least eleven bonds, and that in the analysis of her securities at least eight of these bonds are discussed at length. Although she may not have known the precise difference between the "proceeds of a coupon and a dividend," beyond question she owned not only bonds but also stocks before she ever met the defendant. We are of opinion that it does not appear that she "had" to rely upon the advice of others in all business matters. On the contrary, she testified that she did seek and obtain advice from other brokers, but as a rule she made her own decisions. When she and the defendant were discussing the formation of a corporation, it is apparent that she evinced a not inconsiderable amount of business intelligence.

As was said in *Comstock* v. *Livingston*, 210 Mass. 581, at page 584: "Mere respect for the judgment of another or trust in his character is not enough to constitute . . . a

relation [of trust]. . . . If the relation is a business one, the existence of the mutual respect and confidence does not make it fiduciary." We are of opinion that the case at bar is like *Snow* v. *Merchants National Bank of New Bedford*, 309 Mass. 354, 360–361, and that it is distinguishable from *Hawkes* v. *Lackey*, 207 Mass. 424, 431–433, and *Birch* v. *Arnold & Sears, Inc.* 288 Mass. 125, 129. In the case of *Fardy* v. *Buckley*, 231 Mass. 377, 381, the relation of trust and confidence was expressly admitted by the defendants. In *Israel* v. *Sommer*, 292 Mass. 113, the plaintiff was an attorney and the defendant's intestate was his client.

The "letter" in question was signed by the plaintiff on January 13, 1939. The defendant testified that he purchased stocks upon a margin account with the money obtained from the sale of the securities that the plaintiff gave him, and it appears from the "bought" and "sold" statements of a brokerage firm that on January 24 and 30, 1939, the defendant bought shares of General Electric Company and Richfield Oil Corporation stock for which his account was charged $17,565, and that on April 6, 1939, these shares of stock were sold and his account credited with $14,688.70. It is true that on January 13, 1939, the plaintiff gave the defendant seventy-five shares of General Electric Company stock. These shares, with others, were delivered by the defendant to a broker whose account with the plaintiff showed their receipt by him. The defendant testified that he sold these seventy-five shares and although it does not clearly appear from the record the parties have assumed that they were sold by the broker, and that the proceeds of the sale were included in one of the checks that the broker made payable to the plaintiff which she indorsed over to the defendant, and were also included in the amount of the note that the defendant gave the plaintiff. The defendant was asked about a loan of $1,500 that he said he made from the money derived from the sale of the stocks, and he testified that the loan was repaid. He was asked: "What became of that money?" He replied: "I don't know what became of that; it was used in living expenses." But he had already been asked how much of the money he had left and had testi-

fied that there was a little over $1,000 and that all he lost on his margin account was $2,677. It seems to have been assumed, however, at the trial, that apart from what he lost on the margin account and the $1,000 he had left, he had spent the balance for his living expenses. It seems that the trial of this suit was in January, 1941. There is nothing to show when the defendant began to use any of the money for living expenses. It is true that there was no evidence of any dealings in the stock market by the defendant after April 6, 1939. Apart from the "bought" and "sold" transactions with his brokers, there was no evidence of his account with them.

2. It is true that an inference is permissible that a state of affairs, including a state of mind proved to exist, has existed for some time, *Conroy* v. *Fall River Herald News Publishing Co.* 306 Mass. 488, 493, and cases cited; see *Flynn* v. *Growers Outlet, Inc.* 307 Mass. 373, 377, and that the intent and disposition of a person can be ascertained only from his acts and declarations. *Thayer* v. *Thayer*, 101 Mass. 111, 113. We are of opinion that, in the case at bar, the evidence did not warrant an inference that the defendant, at the time the letter was signed, intended to use the proceeds of the securities for his own benefit or use, in the sense that such use was in violation of any agreement that he had made. It is to be observed in this connection that the trial judge did not find that at the time in question the defendant intended to use the money for living expenses. His findings go only to the extent that he intended to use the proceeds "for his own benefit . . . to his own use." If the transaction between the parties was a loan, as evidenced by the letter, variously referred to by the parties as the agreement or contract, the defendant had a right to use the proceeds derived from the sale of the securities that were turned over to him as anyone would have to use money that he had borrowed, in the absence of some agreement to the contrary, if there was no fraud that would render the transaction voidable. It well may be that, as matters have turned out, the defendant, in so far as the evidence discloses, by using the money for living expenses, has, for the

time being, made it impossible for the plaintiff to recover if the note she received could be sued upon, having in mind that, according to its terms, it is not due until February 1, 1942. But that fact, if it is a fact, in and of itself does not constitute a good reason why the plaintiff can recover against the defendant in some other form of action.

In the opinion of a majority of the court the decree cannot be supported by the findings of the trial judge. In the last analysis, however, it is the duty of this court to decide the case according to its judgment as to the facts, even though it is determined that the judge's decision was plainly wrong. *Berman* v. *Coakley,* 257 Mass. 159, 162.

3. There is no suggestion in the judge's findings that there was any fraud practised by the defendant at the precise time that the "letter" was signed by the plaintiff, and she makes no contention that there was. Over her signature she stated that she fully understood its terms and that she signed it without reliance on anything not expressed therein. The plaintiff's bill states that "after the letter had been read to her by the defendant but without taking time to consider the matter or to consult others, [she] signed" it. In the circumstances, apart from the question whether there are actionable fraudulent representations, she is bound by what she signed. *Nutt* v. *Aldrich,* 267 Mass. 193, 195. *Strong* v. *Boston Mutual Life Ins. Co.* 283 Mass. 88, 90–91. *Darling-Singer Lumber Co.* v. *Commonwealth,* 290 Mass. 488, 492.

4. The plaintiff contends that the case at bar comes within the rule stated in *Bates* v. *Southgate,* 308 Mass. 170, where it was held that a provision in a contract attempting to protect a party against the consequences of his own fraud in inducing the contract is against public policy, is void, and that it is immaterial whether the fraud is antecedent to the contract or entered into its making. That case does not change in any particular the rules of law as to what constitutes the elements of actionable fraud and its consequences, nor is there anything said in it that limits or alters the effect of the parol evidence rule (page 183). The test to be applied to determine whether the plaintiff

is to be relieved of her contract by reason of any fraudulent misrepresentation is the same as that applied in actions of tort for deceit. *Harris* v. *Delco Products, Inc.* 305 Mass. 362, 364.

The plaintiff contends that the fraudulent misrepresentation was that the defendant told her that the proposed transaction involved a transfer of her securities to him as her representative to deal with them on the market, and that he represented that his intention was to buy and sell stocks to invest for the plaintiff when, in fact, he intended to use the proceeds of the securities for living expenses.

In the fall of 1938 when the defendant first spoke to the plaintiff about handling her securities personally, he said to her that it would be easier if he had the stocks in his hands; that he could buy and sell them without asking her; that it would be easier for her to depend on a sure amount instead of a lot one month and a little another month, "to have the same amount every month." He suggested that a corporation be formed, but she "vetoed" this plan. The plaintiff testified that she told the defendant she wanted to arrange her affairs so that she would know what she could depend upon, and that they talked only of "this corporation, and this agreement that . . . [they] made, those two." After several conversations in the fall of 1938, there was another one early in 1939. In answer to the question as to what the defendant said at that time, the plaintiff replied: "That was when I decided he could look after it better than I, and said I would let him have the money." She also testified that the defendant was to have his "commission and whatever was right for him to have." Something was said about drawing up an agreement, the defendant stating that he would have his lawyer do it so that both he and she would feel better about it, and she testified that she "agreed as to that." In answer to a question on direct examination as to whether prior to the time when the "agreement" was signed the defendant had said anything to her about when the securities or money would be returned to her, she inquired of her counsel: "You mean the length of time it was supposed to run?"

When informed that that was the question, she testified: "He said I could have it run one, two or three years," and that she told him "it was a good thing, I would have it run three years." Reverting to the conversations in the latter part of 1938, the plaintiff testified that the defendant told her he was going to buy stocks "with the money"; that he was to give her statements of what he bought and sold every two weeks; that whenever he sold she was to know about it and that he was to pay her interest every month at the rate of six per cent. Nowhere in the plaintiff's testimony as to these conversations is there any reference to a note.

After the conversation in 1939 about having an agreement drawn, the plaintiff was asked if she received a letter from the defendant in regard to the "agreement," and she replied that she had; that it came by mail and that the defendant came to her house "right after the mail" and asked her if "it" had come. She told him that it had. In answer to a question whether she had some conversation with him, she replied: "Why, I just signed it, that was all." She did not read it, but he read it to her and asked her to sign. When asked where they went after the defendant had read the agreement to her, she replied "Well, we had to get those securities for him." They went to the bank where she got certain securities which she gave to him. Among them were some shares of telephone stock which she "rather objected to his changing"; she wanted to keep that stock, but he thought it was better not to. She put a copy of the letter that she had signed in her safe deposit box.

The defendant took the securities to an investment broker who sold them for the plaintiff's account. The broker testified that the defendant asked that the checks for the proceeds be made payable to him, except in one instance. The checks, however, were made payable to the plaintiff, one of which bears the indorsement of the plaintiff and the defendant, and the other is indorsed by the plaintiff to the defendant.

The plaintiff testified that she knew that the buying and selling of securities in the market was more or less of a

hazardous enterprise; that she knew a transaction would sometimes show a profit and sometimes a loss; that she knew the defendant was not guaranteeing infallibility in the stock market; that it seemed to her that their talk was different from the agreement; that ever since she had really looked at the agreement and knew what it said it seemed that their talk was different from it; that there was nothing unintelligible in the sentence to the effect that the transaction amounted to nothing more than a loan as she sees it "now"; that she knows the meaning of the words "loan" and "interest"; that there is nothing in the letter that is not perfectly plain and intelligible to her; that she knew the note was given to her in pursuance of the agreement of January 13; that she knew it represented a debt, and knew that he owed her the amount stated in the note; that she took the defendant's note payable in three years and dated nineteen days after the "agreement" was signed. On June 8 the defendant paid the plaintiff $1,900, and she testified that she knew at that time that he was paying her on account of the principal of the note. At that time she signed a receipt acknowledging payment "on account of the principal" of the note in question "in consideration of which payment said note is hereby ratified and confirmed." She testified that she knows what the words "ratify" and "confirm" mean. The plaintiff also testified that she received checks for the interest; that each month since March, 1939, she had received a check from the defendant for the interest, even down to the date of the trial, the last of which cashed by her was for September, 1939; and that after the $1,900 was paid, the interest payments were diminished accordingly.

When we refer to the letter that the plaintiff signed, it is true that the defendant stated his intention to use the money received from the plaintiff in return for his note in the purchase and sale of stock. But that is immediately followed by the statement that he is under no obligation to do so and that this "transaction" amounts to nothing more than a loan by her to him. When the letter was read to her, the first sentence of which begins "Before you con-

sent to accept my note for three years in consideration of the loan of $17,000 . . ." she said nothing about the reference to the note or as to any other terms of the agreement. We may well assume that the agreement that she signed was different from the "arrangement" that she and the defendant had been discussing. In our opinion, the contention of the plaintiff as to the alleged misrepresentation comes down to this: that she is now seeking to turn one of the terms of a proposed "arrangement" into a misrepresentation of material facts upon which she had a right to rely, and did rely to her damage, so that she may have voided an entirely different contract that she made. The agreement that she signed may not read very much like what she says the proposed arrangement was, but where, as here, it is not open to her to contend that she was induced to sign the agreement by fraud, we are of opinion that she cannot rightly contend that one of the terms of a proposed agreement that never came into existence can be used as a basis upon which to bring the case at bar within the case of *Bates* v. *Southgate,* 308 Mass. 170. Her subsequent conduct has a strong tendency to show that she continued to regard the agreement that she signed as in force and effect, and that she looked to the defendant's note as the basis of any claim that she had against him at least until she asked the defendant to terminate the "arrangement" which seems to have been sometime after June 8, 1939.

Upon consideration of all the evidence, a majority of the court is of opinion that the plaintiff is not entitled to relief. The decree must be reversed and her bill be dismissed.

*Ordered accordingly.*