**In re Brian R. LEARY and Claire F. Leary, Debtors.**

**Brian R. Leary and Claire F. Leary, Plaintiffs,**

v.

**William L. Miller, Defendant.**

**Bankruptcy No. 99–13512–JNF.
Adversary No. 99–1257.**

United States Bankruptcy Court
D. Massachusetts.

Nov. 19, 1999.

William G. Billingham, Marshfield, MA, for debtors.

Stuart I. August, Norwood, MA, for defendant.

Doreen Solomon, Boston, MA, Chapter 13 Trustee.

## MEMORANDUM

JOAN N. FEENEY, Bankruptcy Judge.

### I. INTRODUCTION

The matter before the Court is the Defendant's Motion for Summary Judgment. The Defendant, William L. Miller ("Miller" or the "Defendant") seeks summary judgment on grounds that the Plaintiffs' complaint is barred by the applicable statute of limitations. The Plaintiffs, who are Chapter 13 Debtors before this Court, oppose the Motion. The Motion raises an interesting issue as to whether an action for recision of a 1989 contract for the sale of a business for fraud is barred by the statute of limitations, where the contract is reflected in several documents, two of which contain language to the effect that they are "under seal," thereby triggering a twenty year statute of limitations. A subsidiary issue is whether the Debtors are judicially estopped from pursuing their claims against Miller for failure to list them in their schedules of assets filed in previous bankruptcy cases.

### II. FACTS

The Debtors filed a voluntary petition under Chapter 13 on April 27, 1999. Each previously had filed a voluntary petition under Chapter 7 and had received a discharge. Mrs. Leary filed a voluntary Chapter 7 on October 20, 1992 and received a discharge on February 9, 1993. Mr. Leary filed a voluntary Chapter 7 on February 24, 1993 and received a discharge on June 30, 1993. In their Chapter

7 cases, both Debtors failed to list their claims against Miller on Schedule B—Personal Property. On Schedules A—Real Property, Mrs. Leary listed the value of their home located at 421 Union Street, Rockland, Massachusetts as $120,000. In her case, on Schedule D—Creditors Holding Secured Claims, she also listed Lomas Mortgage USA as the holder of a first mortgage on the Rockland property with a secured claim of $121,094.18. Mr. Leary listed the same value for the home and the same amount for the first mortgage in his Chapter 7 case. On Schedule I—Monthly Income of Individual Debtor(s), both Debtors listed income for Mr. Leary of $800 per month attributable to regular income from the operation of a business. The Debtors' Chapter 7 cases were closed as "no-asset" cases.

In their Chapter 13 case, the Debtors, on Schedule A—Real Property, listed their home with a present value of $158,000. On Schedule B, they listed their claim against Miller, which they valued at $80,000. On Schedule D—Creditors Holding Secured Claims, the Debtors listed a mortgage obligation to First National Mortgage in the sum of $114,461 and a mortgage obligation to Miller in the sum of $70,000.[1]

Miller timely filed a proof of claim in the Debtors' Chapter 13 case in the amount of $99,542.47. He attached to his proof of claim a promissory note dated April 8, 1989 pursuant to which the Debtors promised to pay him $50,859.79 at 11% interest per annum, payable in 258 weekly installments of $250.21 with a payment of $1,250.21 due on April 14, 1989. The note contained a provision that it was secured by both a security interest in candy and flower routes and the Debtors' home in Rockland. Although Miller did not attach a copy of the mortgage securing the promissory note, he attached an accounting of payments received. That accounting reflected a $2,000 payment on March 3, 1989

and a $55,250 payment on March 31, 1989 as well as lesser payments totaling $3,000.21 as of April 7, 1989, the date of the promissory note. The accounting also indicated that the Debtors paid Miller $1,250.21 on April 13, 1989, leaving a balance of $49,717.17 on that date. The notation "Completes $60,000 down" followed that accounting entry.

The Debtors filed their complaint against Miller on May 26, 1999. In their complaint, they alleged that they purchased a candy and flower route business from Miller for $110,000 with the purchase price allocated as follows:

| | |
|---|---:|
| (a) fixtures and equipment | $2,000 |
| (b) covenant not to compete | $8,000 |
| (c) inventory | $2,000 |
| (d) customer list | $50,000 |
| (e) goodwill | $48,000 |
| Total | $110,000 |

The Debtors indicated that a document, captioned "Bill of Sale," reflected the allocation of the purchase price to the assets. This document, which was dated March 3, 1989 and signed by Miller and the Debtors, referenced a total purchase price for the assets of $110,000, a $2,000 down payment, and a promissory note in the sum of $108,000, which the Debtors were to execute contemporaneously. It also provided that it was "EXECUTED as a sealed instrument this 3rd day of March, 1989."

The Debtors further alleged that they paid Miller $60,000 in cash, which they obtained by refinancing their residence and that Miller financed the remaining $50,859.79 of the purchase price through a promissory note secured by a second mortgage on their residence. The Debtors attached a copy of that note to the complaint. It provided the following:

This note is secured by a security interest in certain collateral of the candy routes and Roseco flower routes and the undersigneds' [sic] home at 471 Union Street, Rockland, Massachusetts as de-

---

1. The Debtors listed minimal unsecured debt, $2,000, as a result of the discharge orders

entered in their Chapter 7 cases.

scribed in the Security Agreement executed this date by the maker and the holder.

The mortgage, which was witnessed and notarized, was signed by the Debtors under the language "WITNESS our hands and seals this seventh day of April 1989."

In their complaint, the Debtors stated that in addition to paying Miller $60,000, they made monthly payments of $1,000 for 15 months but that the flower route could not support the monthly payments and that they had not been able to make any payments on the note since 1990. Miller declared the note in default on January 6, 1993.[2]

The Debtors, who were not represented by counsel in their acquisition of the flower route business, stated that Miller fraudulently misrepresented the value of the assets he sold them. They further stated that the equipment and fixtures had a value of $200; the covenant not to compete had no value because the convenience stores serviced by Mr. Leary had turned their business over to another flower operator with a similarly named operation; the inventory had no value because there was none; the customer list had minimal, if any value, because it was just a list of retail stores in the area Mr. Leary was to service; and that the good will also had no value. The Debtors alleged that Miller also fraudulently misrepresented the income stream obtainable from the candy and flower route in a written "Financial Overview," upon which they relied to their detriment.

Although the parties have not stipulated that Miller drafted the contract documents, the Court infers that he, in fact, did so. A comparison of the "Financial Overview" prepared by Miller and all other relevant contract documents, including the Bill of Sale, the equipment list attached to the Bill of Sale as Exhibit A, the covenant not to compete, and the Promissory Note bearing the heading "Sharon, Massachusetts," appear to have all been prepared on the same typewriter or computer as the typeface on the documents is both unique and identical.[3]

Based upon these allegations, the Debtors formulated two counts: one for common-law fraud and the other for recision of the contract. In short, the Debtors seek to avoid the transfer of an interest in their residence to Miller.[4]

## III. POSITIONS OF THE PARTIES

Miller relies upon the six year statute of limitations set forth in Mass.Gen.L.Ann. Ch. 260, § 2 (West 1992) for contract actions. In his view, the Debtors knew, at the latest, that there was, as alleged, a failure of consideration or fraud in 1992 and the statute of limitations began running from that date. Miller also cited *Payless Wholesale Distributors, Inc. v. Alberto Culver (P.R.), Inc.*, 989 F.2d 570 (1st Cir.1993), in support of his assertion that the Debtors should be judicially estopped from pursuing their claims against him in their Chapter 13 case because they failed to list the claims in their Chapter 7 cases.

The Debtors rely upon the twenty year statute of limitations found in Mass.Gen.L.Ann. Ch. 260, § 1 (West 1992) with respect to contracts under seal. Specifically, they argue that because the so-called Bill of Sale and Mortgage were under seal the entire contract was under seal. With respect to Miller's judicial estoppel argument, they maintain that they were unaware of their cause of action against him at the time of their Chapter 7 filings and did not intend to defraud creditors.

## IV. DISCUSSION

### A. *Summary Judgment Standard*

The party moving for summary judgment has the burden of establishing the

**2.** Mr. Leary also stuffed envelopes for Mr. Miller and painted his homes in Dennisport and Sharon, Massachusetts.

**3.** The Debtors alleged that Miller portrayed himself as an experienced businessman. Miller admitted this allegation.

**4.** *See* note 8, *infra.*

absence of a genuine issue of material fact and that he is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c), made applicable to this proceeding by Fed. R.Bankr.P. 7056. For the reasons that follow, the Court finds that Mr. Miller has failed to sustain his burden of proof on his statute of limitations defense and judicial estoppel defenses.

B. *The Applicable Statute of Limitations*

■ The Debtors seek the rescission of their contract with Miller. In *Colil v. Massachusetts Security Corp.*, 247 Mass. 30, 33, 141 N.E. 580 (1923), the court articulated the following rule with respect to rescission:

> The right to rescind or avoid a contract proceeds upon the ground that a party has been fraudulently betrayed into making it, and, having thus been induced to part with his own property, may resume possession of it on returning that which he has himself received, and thus placing the other party in the same position that he was before the contract was made.

This rule is subject to the exception that return or tender of return is not required if what was obtained was worthless. *Soliman v. Digital Equip. Corp.*, 869 F.Supp. 65, 69 (D.Mass.1994).

■ The Debtors alleged that Miller fraudulently misrepresented the value of the assets that they purchased and the income generated by the flower and candy routes. To prove the fraudulent misrepresentation, they must prove the elements of common law deceit. Massachusetts law is stated succinctly as follows:

"One party cannot enforce a contract against another whose signature he has procured by fraud or fraudulent representations, which induced the signer reasonably to believe and understand that the instrument was substantially different from what it really was." *Boston Five Cents Sav. Bank v. Brooks*, 309 Mass. 52, 55, 34 N.E.2d 435 (1941). See Restatement (Second) of Contracts § 164(1) (1981). To establish fraud in the inducement, and thereby be relieved of the effect of the notes, ... [the Plaintiff] ... was required to establish the elements of common law deceit, *Plumer v. Luce*, 310 Mass. 789, 801–802, 39 N.E.2d 961 (1942), which include "misrepresentation of a material fact, made to induce action, and reasonable reliance on the false statement to the detriment of the person relying." *Hogan v. Riemer*, 35 Mass.App.Ct. 360, 365, 619 N.E.2d 984 (1993). "[T]he parol evidence rule does not apply when the complaining party alleges fraud in the inducement." *McEvoy Travel Bureau, Inc. v. Norton Co.*, 408 Mass. 704, 711 n. 5, 563 N.E.2d 188 (1990).

*Commerce Bank & Trust Co. v. Hayeck*, 46 Mass.App.Ct. 687, 692, 709 N.E.2d 1122 (1999). Accordingly, the parole evidence rule would not prevent the Debtors from introducing evidence as to the circumstances surrounding the transaction in which they purchased the candy and flower routes from Mr. Miller.[5]

Assuming that the Debtors can prove that Miller fraudulently induced them into paying $110,000 for assets that they alleged were essentially worthless and, thus, can rescind the contract by returning to

---

5. Alternatively, the Court finds that the Bill of Sale and promissory note are ambiguous when considered together. In the first place, the Bill of Sale references a promissory note in the amount of $108,000 which was not introduced as an exhibit and may or may not have been executed by the Debtors. Because the Debtors paid Mr. Miller $60,000 and executed a promissory note in the amount of $50,859.79, the potential exists that the March agreement may have been modified as to payment terms and the need for additional collateral. Parole evidence might explain this factual anomaly. Secondly, the promissory note of April 7, 1989 references a Security Agreement that apparently was not executed by the parties, but may nevertheless raise a potential issue under 11 U.S.C. § 1322(b)(2). *See* note 8, *infra*.

Miller the equipment and other personalty that they received from him, their obligation under the note would cease and Miller's second mortgage on their home would secure nothing. 54A Am.Jur.2d, Mortgages, § 61 (1996). *Cf. Hazard v. Irwin*, 35 Mass. 95, 1836 WL 2428 at *6 (1836).

■ The Debtors' ability to go forward to trial on the underlying merits of their claim against Mr. Miller, which the Court just articulated, depends upon whether the twenty year or six year statute of limitations applies to the claim. The transaction pursuant to which the Debtors purchased the flower route from Miller was not well documented. Indeed, what may have been the purchase and sale agreement, was labeled a "Bill of Sale." [6] This document, which must be construed against its drafter, contains language (i.e., "Executed as a sealed instrument") sufficient to make it a sealed instrument. *Nalbandian v. Hanson Restaurant & Lounge, Inc.*, 369 Mass. 150, 151 n. 2, 338 N.E.2d 335 (1975). In *Nalbandian*, the Supreme Judicial Court, citing *Marine Contractors Co. v. Hurley*, 365 Mass. 280 n. 2, 310 N.E.2d 915 (1974), 365 Mass. 280, 310 N.E.2d 915 (1974), determined that language in an agreement that recited that it was "(s)igned and sealed" was by virtue of Mass.Gen.Laws. Ann. Ch. 4, § 9A (West 1996),[7] sufficient to give the instrument the legal effect of a sealed instrument.

■ The Bill of Sale, however, does not contain all the material terms of the contract. Although the document refers to a $2,000 down payment and the execution of a promissory note in the amount of $108,-000, the Debtors paid Miller approximately $60,000 in cash and financed the balance of the $110,000 purchase price for the business. The issue that confronts this Court is whether the execution of a document under seal that is but one part of the entire agreement of the parties can serve to lever the entire transaction into one to which the twenty year statute of limitations applies. The parties have cited no authorities that directly bear on this issue, and the Court has found none. Competing policies weigh for and against both sides. On the one hand, the Debtors knew of Miller's misrepresentations well within the six year statute of limitations applicable to contracts and fraud. On the other hand, the Bill of Sale, which indicates that it is executed as a sealed instrument, as well as the other contract documents, were drafted by Miller and, thus, should be construed together and against Mr. Miller. As the court stated in *Leasecomm Corp. v. Crockett*, 1998 Mass.App.Div. 6, 1998 WL 15935 at *3 (1998), "[w]here two or more contracts are part of a single transaction and appear in combination ... to constitute the entire understanding of the parties, the contracts are customarily read together as one, integrated agreement." In *Gilmore v. Century Bank & Trust*, 20 Mass.App.Ct. 49, 55, 477 N.E.2d 1069

**6.** Black's Law Dictionary defines a bill of sale as follows:

> In contracts, a written agreement, formerly limited to one under seal, by which one person assigns or transfers his right to or interest in goods and personal chattels to another. Legal document which conveys title to seller to buyer.

Black's Law Dictionary. 149 (5th ed.1979).

**7.** Section 9A provides the following:

> In any written instrument, a recital that such instrument is sealed by or bears the seal of the person signing the same or is given under the hand and seal of the person signing the same, or that such instrument is intended to take effect as a sealed instrument, shall be sufficient to give such instrument the legal effect of a sealed instrument without the addition of any seal of wax, paper or other substance or any semblance of a seal by scroll, impression or otherwise; but the foregoing shall not apply in any case where the seal of a court, public office or public officer is expressly required by the constitution or by statute to be affixed to a paper, nor shall it apply in the case of certificates of stock of corporations. The word "person" as used in this section shall include a corporation, association, trust or partnership.

Mass.Gen.Laws Ann. Ch. 4, § 9A.

.

(1985), the court identified such factors as "simultaneity of execution, identity of subject matter and parties, cross referencing, and interdependency of provisions." Most of these factors are present in the instant case. Although the Bill of Sale and the promissory note and mortgage were executed approximately one month apart, the subject matter and parties to the agreement were the same and the promissory note referenced the candy and flower routes that were the subject of the Bill of Sale. Nevertheless, all the material facts necessary to resolve the issue of whether an integrated contract existed are not before the Court.

With respect to contracts under seal, in *Nalbandian,* the Supreme Judicial Court observed that the following

> The practice of sealing written documents is centuries old, its importance originally being as a means of authentication in times when most persons were unable to write their names. See 2 W. Blackstone, Commentaries *305–306; O.W. Holmes, Jr., The Common Law 271–272 (1881); 7 J. Wigmore, Evidence s 2161 (3d ed.1940). Moreover, the seal came also to serve the evidentiary function of rendering documents indisputable as to the terms of the underlying transaction and thereby dispensed with necessity of proof by the summoning of witnesses. 9 J. Wigmore, Evidence s 2426 (3d ed. 1940)....

> The importance of the seal, however, has greatly diminished from the early days of the common law to the present time. The vast majority of American jurisdictions have, in fact, either abolished the seal or so modified or limited its use as to render it without legal effect for most purposes.... Moreover,

legal scholars have questioned or criticised [sic] the continued significance attached to the seal for any purpose and have advocated its total eradication. E.g., B. Cardozo, The Nature of the Judicial Process 155 (1921); O.W. Holmes, Jr., The Common Law 273 (1881). Significantly, this decline of the seal has in many jurisdictions resulted in the abolition of the distinction between sealed and unsealed instruments in the undisclosed principal situation. E.g., *Southern Pac. Co. v. Von Schmidt Dredge Co.,* 118 Cal. 368, 50 P. 650 (1897); *Lake Shore Management Co. v. Blum,* 92 Ill.App.2d 47, 235 N.E.2d 366 (1968); *Efta v. Swanson,* 115 Minn. 373, 132 N.W. 335 (1911); *Donner v. Whitecotton,* 201 Mo.App. 443, 212 S.W. 378 (1919).

369 Mass. at 154–55, 338 N.E.2d 335. Although the significance of contracts under seal has diminished, the statute of limitations with respect to sealed and unsealed contracts differ, and the statute of limitations with respect to sealed contracts is still good law. Thus, in the context of this case, a determination that the Bill of Sale and other documents should be integrated can mean the difference between a remedy or the potential loss of their home for the Debtors.[8] The Court needs testimony to resolve this issue.

### C. Judicial Estoppel

■ In *Payless Wholesale Distributors,* Payless, the Chapter 11 debtor, failed to list a cause of action against Alberto Culver (P.R.), Inc. and others in its schedules and in its disclosure statement. After exiting bankruptcy, it sued Alberto Culver and others for monetary damages between $5 and $150 million dollars. The United

---

8. This Court, as a court of equity, is mindful that the Debtors have paid Mr. Miller approximately $75,000 for assets that the Debtors alleged (and Mr. Miller has yet to dispute) had nominal, if any, value in 1989. Thus, in addition to the claims they have already asserted, the Debtors could potentially have other claims for relief, such as equitable subordination pursuant to 11 U.S.C. § 510(c) and/or modification and lien stripping of the mortgage pursuant to 11 U.S.C. §§ 1322(b)(2) and 506(a), (d). Assertion of these claims would require the Debtor to file a motion for leave to amend their complaint, subject to Miller's right to object to any amendment.

States Court of Appeals for the First Circuit, clearly outraged at Payless' conduct, dismissed its suit against the defendants, stating the following:

> The basic principle of bankruptcy is to obtain a discharge from one's creditors in return for all one's assets, except those exempt, as a result of which creditors release their own claims and the bankrupt can start fresh. Assuming there is validity in Payless's present suit, it has a better plan. Conceal your claims; get rid of your creditors on the cheap, and start over with a bundle of rights. This is a palpable fraud that the court will not tolerate, even passively. See, e.g., *In re H.R.P. Auto Center, Inc.,* 130 B.R. 247, 253–54 (Bankr.N.D.Ohio 1991) (collecting cases). Payless, having obtained judicial relief on the representation that no claims existed, can not now resurrect them and obtain relief on the opposite basis. This may not be strictly equitable estoppel, as the court observed. Indeed, defendants may have a windfall. However, it is an unacceptable abuse of judicial proceedings.

989 F.2d at 571. In *Donato v. Metropolitan Life Ins. Co.,* 230 B.R. 418 (N.D.Cal. 1999), the court, distinguishing *Payless,* observed that in *Payless* the debtor's failure to disclose assets "deprived creditors of their proper share of assets of the estate and would have been a windfall to the plaintiff had the court allowed the litigation to proceed." 230 B.R. at 424.

The Court finds that the Debtors may be able to rely upon the *Donato* decision and, thus, the issue of judicial estoppel is not ripe for adjudication. Although the Debtors list the value of the claim against Miller as $80,000 in their Chapter 13 complaint, the complaint clearly is focused on the avoidance of Miller's mortgage and does not reference a dollar amount for damages. Moreover, the Debtors' intention at the time they filed their bankruptcy petition is a question of fact. Their attorney has represented that neither he nor the Debtors were aware of their claims against Miller in 1992 and 1993 but that assertion is not supported by evidence. The Court, however, notes that if the Debtors had sought the avoidance of Miller's mortgage in their Chapter 7 cases, the avoidance would not have resulted in any benefit to the unsecured creditors as the Debtors lacked equity in their Rockland home. The unsecured creditors would only have benefitted if the Debtors had sought and recovered damages for breach of contract, fraud or violation of the consumer protection laws. Accordingly, the Court finds that questions of fact exist as to the Debtors' knowledge and intention and denies Miller's Motion for Summary Judgment.

## V. CONCLUSION

In view of the foregoing, the Court hereby denies the Defendant's Motion for Summary Judgment. The Court shall set a trial date.