**Dean ROWSE and Helen Rowse, Plaintiffs,**

v.

**PLATTE VALLEY LIVESTOCK, INC., a Nebraska corporation, Defendant.**

No. CV84–L–227.

United States District Court,
D. Nebraska.

March 14, 1985.

Richard A. Koehler, Geneva, Neb., D.L. Pelton, Papillion, Neb., for plaintiffs.

Robert M. Cook, Norfolk, Neb., for defendant.

Sally Johnson, Asst. U.S. Atty., Lincoln, Neb., for intervenor United States of America.

## MEMORANDUM OF DECISION

URBOM, Chief Judge.

Trial was had December 11, 1984, on the plaintiffs' complaint to enforce a reparations order issued in their behalf by the Secretary of Agriculture under § 309 of the Packers and Stockyards Act of 1921, as amended (codified as 7 U.S.C. § 210). Evidence was taken on both the count seeking enforcement of the order and on a second count seeking damages for interest paid by the plaintiffs on a loan they procured to replace the capital lost in the bad-check transaction underlying the reparations count.

The basic facts and history of the case have been stated previously, see Memorandum and Order on Motion for Summary Judgment and Motion to Dismiss (Nov. 2, 1984), 597 F.Supp. 1055, filing 23, and need not be repeated. In that memorandum I found that the Secretary and this court had subject matter jurisdiction because the alleged activity of the defendant constituted a "practice" under 7 U.S.C. § 208(a). Now the legal issue in the first count concerns whether the defendant's "practice" was "unjust, unreasonable, or discriminatory" under § 208(a).

■ The preliminary question is whether there is substantial evidence on the administrative record to support the Secretary's findings. *Rice v. Wilcox*, 630 F.2d 586, 591 (8th Cir.1980); 5 U.S.C. § 706(2)(E). If so, then "the findings and orders of the Secretary shall be prima facie evidence of the facts therein stated." 7 U.S.C. § 210(f). If not, then the Secretary's order is inadmissible. *Mid-South Order Buyers, Inc. v. Platte Valley Livestock, Inc.*, 210 Neb. 382, 396, 315 N.W.2d 229, 236 (1982). Under the prima facie evidence standard, the defendant may introduce evidence to rebut the prima facie effect of the order. *Id.; cf. ICC v. Atlantic Coast Line Railroad Co.*, 383 U.S. 576, 594, 86 S.Ct. 1000, 1011, 16 L.Ed.2d 109 (1966) (interpreting similar provision of Interstate Commerce Act, § 16(2)).

Having examined the administrative record, including the hearing transcript, I find there to be substantial evidence to support at least those of the Secretary's findings of fact that establish a violation of § 208. Therefore, pursuant to § 210(f), the plaintiffs have sustained their burden of going forward with the evidence, assuming the correctness of the Secretary's interpretation of the law, the second question in the present inquiry.

While the Secretary's findings of law must be reviewed *de novo, Rice,* 630 F.2d at 589; 5 U.S.C. § 706, it is a tenet of judicial review of administrative decisions that "[w]hen faced with a problem of statutory construction" courts are bound to give "great deference to the interpretation given the statute by the officers or agency charged with its administration." *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1964). This principle applies to the problem of fleshing out the meaning of the § 208 prohibition of "every unjust, unreasonable, or discriminatory regulation or practice" with respect to the furnishing of stockyard services. *Hays Livestock Commission Co. v. Maly Livestock Commission Co.,* 498 F.2d 925, 930 (10th Cir.1974); *United States v. Donahue Brothers,* 59 F.2d 1019 (8th Cir.1932). The Secretary's interpretation of the facts, to the effect that the defendant engaged in an unjust and unreasonable practice violative of § 208, is to be accorded great deference if the factual findings are supported by substantial evidence. *Id.* at 931; *Van Wyk v. Bergland,* 570 F.2d 701, 705 (8th Cir. 1978). As the court noted in *Hays Livestock,* this level of deference arises because the statute fails to define the critical phrase, leaving its meaning to " 'be determined by the facts of each case within the purposes of the Packers and Stockyards Act,' " and because " 'the responsibility for efficient regulation of market agencies and packers lies with the Secretary of Agriculture....' " 498 F.2d at 930 (quoting *Capitol Packing Co. v. United States,* 350 F.2d 67, 72, 76 (10th Cir.1965)).

Several sections of the Nebraska Uniform Commercial Code clarify the legal rights of the parties: the Rowses; Ken Kaba, the buyer; and the defendant, Platte Valley, the consignment seller. "Where payment is due and demanded on the delivery to the buyer of goods or documents of title, his right as against the seller to retain or dispose of them is conditional upon his making the payment due." Neb.Rev.Stat. UCC § 2–507(2) (Reissue 1980). "[P]ayment by check is conditional and is defeated as between the parties by dishonor of the check on due presentment." UCC § 2–511(3).

(1) ... A person with voidable title has power to transfer a good title to a good faith purchaser for value. When goods have been delivered under a transaction of purchase the purchaser has such power even though

. . . . .

(b) the delivery was in exchange for a check which is later dishonored, or

. . . . .

(d) the delivery was procured through fraud punishable as larcenous under the criminal law.

(2) Any entrusting of possession of goods to a merchant for purposes of sale who deals in goods of that kind gives him power to transfer all rights of the entruster to a buyer in ordinary course of business.

UCC § 2–403.

Under these rules, the Rowses had the right to recover the cattle when they discovered that Kaba's check had been dishonored. *Peck v. Augustin Brothers Co.,* 203 Neb. 574, 279 N.W.2d 397 (1979); *see* J. White & R. Summers, *Handbook of the Law under the Uniform Commercial Code* § 3–6, at 115 (2d ed. 1980). The fact that after their dishonor Dean Rowse allowed Kaba a short time to make good the checks did not change the rights between the Rowses and Kaba, retroactively alter the state of title, or turn the sale into a credit transaction. By the time the Rowses learned of the dishonor, the cattle had been sold on consignment by Platte Valley for Kaba's account, and the various purchasers obtained good title even though Kaba's title was only conditionally valid at the time of the auction sale and even though the condition failed. As an agent for Kaba, selling on commission, Platte Valley's rights could rise no higher than those of its principal. *Mid-South Order Buyers, Inc. v. Platte Valley Livestock, Inc.,* 210 Neb. 382, 395, 315 N.W.2d 229, 236 (1982). As against the Rowses, neither Kaba nor his agent was entitled to the proceeds, because

Kaba's rights were only conditional until the checks cleared. However, at the time of the sale and disposition of proceeds Kaba's checks had not yet been dishonored. Therefore, no conversion action would lie under state law, at least as to the portion of the proceeds sent to Dale Van Wyk, because the Rowses did not then have an immediate right to possession. *Allen v. Dealer Assistance, Inc.*, 207 Neb. 455, 299 N.W.2d 744 (1980).

Whether Platte Valley's distribution of the sale proceeds to itself and Dale Van Wyk, a creditor of Kaba, or its retention of the portion of the proceeds it kept to offset Kaba's debt to it, after the Rowses' possessory interest was revived or after the Rowses demanded the money, would be actionable under state conversion law is relevant here only to the extent that the question casts light on what an unjust practice is under the federal law—the plaintiff's suit is based on the federal law rather than any state law.

Regardless of the legality of Platte Valley's original distribution of the proceeds, its retention of a portion after being informed of the Rowses' claim was unjustified. At that point Platte Valley's president, Gene Lenhart, knew that the Rowses had not been paid and that they were the true owners of the cattle, as between them and Kaba, rendering ineffective Kaba's oral approval of Platte Valley's distribution of the proceeds. Platte Valley should have paid to the Rowses the portion of the proceeds still in its hands once Lenhart learned the full facts, as it had done for the Rezac Brothers after the Rezacs complained that Kaba had not paid them for cattle he purchased from them and sold through Platte Valley.

▌ The proceeds from the cattle sale were trust funds in Platte Valley's hands. 9 C.F.R. § 201.42. A trustee may not offset a debt owing to the trustee individually and not as trustee. *Mid-South Order Buyers, Inc. v. Platte Valley Livestock, Inc.*, 210 Neb. 382, 394, 315 N.W.2d 229, 235 (1982). The conversion or commingling of trust funds is an unjust practice under

the Packers and Stockyards Act. *United States v. Donahue Brothers*, 59 F.2d 1019 (8th Cir.1932).

▌ The majority rule at common law is that an auctioneer who sells goods on behalf of a principal who lacks valid title, or who holds it subject to a mortgage or other lien, or who for other reasons has no right to dispose of it, is liable to the true owner, lien holder, or conditional vendor for conversion, despite the auctioneer's good faith and lack of knowledge of the competing interest. *Annot.*, 96 A.L.R.2d 208, 210 (1964). The Nebraska Supreme Court adopted the majority rule in *State Securities Co. v. Svoboda*, 172 Neb. 526, 110 N.W.2d 109 (1961). The state legislature responded by enacting Neb.Rev.Stat. § 69–109.01, which exempts from liability an auctioneer who in good faith and without notice of a "security interest" sells personal property at auction for a principal whose identity has been disclosed, if the auctioneer has no interest and only acts as an intermediary of the owner. The statute did not abrogate the common law rule, but only provided an exemption if the statutory conditions are met. *State Securities Co. v. Norfolk Livestock Sales Co.*, 187 Neb. 446, 449, 191 N.W.2d 614, 617 (1971) (also holding that the Packers and Livestock Act did not exempt livestock auctioneers from liability for conversion under *Svoboda*).

▌ The Secretary found that the defendant "did not, so far as the records shows, make the disclosure of the principal's identity required by" § 69–109.01. As the court held in *Norfolk Livestock Sales*, disclosure must be made by some form of public announcement prior to the sale, and simple notation on documents open to public inspection does not suffice. At trial Lenhart testified that at the auction he did announce Kaba's name as the seller of the cows. Even if this is sufficient to rebut the Secretary's finding on that point, the Rowses, as the Secretary observed, were defrauded cash sellers upon the dishonor of the checks, not holders of a security interest. The right to reclaim created by UCC § 2–507(2) "is a right to undo

the transaction, not a right to 'secure' payment of the price as required by the definition of 'security interest'" under UCC § 1–201(37). *Guy Martin Buick, Inc. v. Colorado Springs National Bank,* 184 Colo. 166, 519 P.2d 354, 359 (1974) (en banc); *cf. In re Mel Golde Shoes, Inc.,* 403 F.2d 658 (6th Cir.1968) (seller's right to reclaim goods from insolvent buyer under UCC § 2–702(2) is not a "security interest"). Therefore, Neb.Rev.Stat. § 69–109.01 does not override the *Svoboda* rule concerning an auctioneer's liability to the true owner notwithstanding lack of actual notice of the competing claim.

■ Under the regulations promulgated by authority of 7 U.S.C. § 228(a), a market agency may not pay the net proceeds from a consignment sale to anyone other than the consignor or shipper unless "(1) such market agency has reason to believe that such person is the owner of the livestock, (2) such person holds a valid, unsatisfied mortgage or lien upon the particular livestock, or (3) such person holds a written order authorizing such payment executed by the owner at the time of or immediately following the consignment of such livestock...." 9 C.F.R. § 201.39(a). Neither recipient of the net proceeds from the sale of the Rowse cattle was the owner or a mortgage or lien holder with respect to those 108 cows. Though Kaba obtained oral permission from Kaba, the apparent owner, he knew that Kaba had recently failed to pay for cattle he had purchased from three others, including Platte Valley itself.

Platte Valley argues that Lenhart could not have been expected to discover the Rowses' continued interest in the cattle at the time of the auction sale or distribution of proceeds. It is true that on February 28 the checks had not yet bounced and that no one, except perhaps Kaba and his bank, knew that they might. Also, all of the specific information that Lenhart had about the Rowse cattle was consistent with the idea that Kaba had paid for them. However, in light of what he knew about Kaba's recent failures to pay for cattle, Lenhart should have asked Kaba if the Rowses had been paid. Nothing in the record indicates that such an inquiry would have been fruitless. Had Kaba told Lenhart that the cattle proceeds were necessary to make the checks good, Platte Valley should have paid them either to Kaba, so that the checks would be covered, or directly to the Rowses, either of which would have been allowed by the regulation quoted above. Had Kaba assured Lenhart that there was no problem with the payment to the Rowses, then Platte Valley could not be charged with knowledge of the flaw in Kaba's title.

In the cases most closely analogous to the present suit, the market agencies actually knew before they offset the proceeds that the cattle sellers had not been paid by the consignors. *E.g., Rice v. Wilcox,* 630 F.2d 586 (8th Cir.1980); *Mid-South Order Buyers.* However, in *Rice* the hearing officer had noted that it was an unjust practice for the market agency to retain the proceeds in payment of the consignor's debts owed to it with knowledge that the consignor had not paid the owner, or " 'with timely notice of sufficient facts to cause a reasonably prudent person to make a further investigation to ascertain whether there was an adverse interest in the cattle.'" 630 F.2d at 588 n. 2. The Secretary reiterated that interpretation of the statute in the present case.

Aside from the rule that the Secretary's interpretation is entitled to great weight, the view that actual knowledge on the part of the market agency is not necessary for a violation of § 208 is supported by the policies behind the Act. One purpose of the Act is "to protect the owner and shipper of live stock, and to free him from the fear that the channel through which his product passed, through discrimination, exploitation, overreaching, manipulation, or other unfair practices, might not return to him a fair return for his product." *United States v. Donahue Brothers,* 59 F.2d 1019, 1023 (8th Cir.1932); *accord Mid-South Order Buyers,* 210 Neb. at 394, 315 N.W.2d at 235 ("One of the apparent purposes of this

regulation is to prevent the market agency from using the trust account to finance its own operations. Concomitant with that purpose is the objective of assuring that the seller of the cattle is paid."). The offset of a debt unrelated to the transaction and the payment of sale proceeds to one of the market agency's president's friends, who had become a creditor of the consignor in an unrelated transaction, were exercises of dominion over the proceeds that were inconsistent with the agency's limited roles as the auctioneer of the cattle and the trustee of the proceeds. The Secretary's interpretation of the disbursement regulation limits the agency's power to make decisions about who is entitled to proceeds, leaving those decisions instead in the hands of those in a better position to know the relevant facts. It promotes stability and certainty in the marketing of livestock by eliminating the ability of the market agency to favor some of the consignor's creditors, including itself, over others, and by restricting the payment of the proceeds to those directly involved with the cattle from whose sale they arose. Under this view, when the market agency puts on judicial robes to weigh the competing claims of the consignor's creditors, it assumes the risk of personal liability if it chooses to make a payment not authorized by the regulation and it turns out that payment according to the regulation was necessary to pay the seller.

The fact that Kaba orally authorized the payment does not change the outcome. First, his right to dispose of either the cattle or the proceeds was conditional upon his check being honored. When the payment failed, and the Rowses right to reclaim arose, Kaba's authorization became voidable, and was indeed voided when the Rowses claimed the proceeds. Second, it was not "a written order authorizing such payment executed by the owner." 9 C.F.R. § 201.39(a)(3). It was not written, and Kaba was only the conditional owner. Third, as the Secretary found, Lenhart was not entitled to rely on Kaba's authorization, in light of what he knew about Kaba's recent financial dealings, without inquiring

into whether the proceeds were needed to pay for the cattle. Deference to the Secretary's interpretation of the duties of market agencies vis-a-vis cattle sellers is appropriate on this point.

The evidence presented at trial by the defendant to rebut the plaintiff's prima facie case does not change the legal result. The new evidence reinforces the fact that Lenhart did not actually know that the Rowses had not been paid, but it also reiterates that Lenhart did not inquire of Kaba about whether the Rowses had been paid, although he knew that Kaba had failed to pay for cattle on three other recent occasions. The evidence shows that the proceeds from the sale of the Rowse cattle were not disbursed until after Lenhart obtained oral permission from Kaba and it raises a question as to whether Lenhart told Kaba what would happen to the proceeds before he asked his approval or asked him first; however, given the view I have taken of the law and the weight I have accorded the Secretary's interpretation of the market agency's duties, it would make no difference even if I were to take Lenhart's testimony as true on every point.

Therefore, to the extent that it finds the defendant liable for the gross proceeds of the sale of the Rowse cattle, the reparations award is supported by substantial evidence and is based on a correct interpretation of the law, and the defendant has failed to rebut the plaintiff's prima facie case.

■ Two questions remain: First, is the reparations order's award of prejudgment interest authorized by law? Second, does the court have jurisdiction to award the plaintiffs damages for actual interest expenses, though the reparations award did not do so, and, if it does, have the plaintiffs proven their entitlement to such damages?

■ The underlying obligation of the defendant arose from federal law, so federal law applies to the question of damages. *Cf. Textile Workers v. Lincoln Mills*, 353 U.S. 448, 456, 457, 77 S.Ct. 912, 917, 918, 1 L.Ed.2d 972 (1957); *Clearfield Trust Co. v.*

*United States*, 318 U.S. 363, 366–67, 63 S.Ct. 573, 574–75, 87 L.Ed. 838 (1943); *United States v. Bass*, 215 F.2d 9, 15 (8th Cir.1954). In the absence of a federal statute allowing or barring recovery of interest, it is for the federal courts to determine the appropriate measure of damages, including interest, for non-payment of the amount found to be due. *Royal Indemnity Co. v. United States*, 313 U.S. 289, 296, 61 S.Ct. 995, 997, 85 L.Ed. 1361 (1941). The courts fashion rules granting or denying prejudgment interest on particular statutory obligations by an appraisal of the congressional purpose in imposing them and in light of general principles of damages. *Rodgers v. United States*, 332 U.S. 371, 373, 68 S.Ct. 5, 6, 92 L.Ed. 3 (1947).

> [A] persuasive consideration in determining whether such obligations shall bear interest is the relative equities between the beneficiaries of the obligation and those upon whom it has been imposed. And this Court has generally weighed these relative equities in accordance with the historic judicial principle that one for whose financial advantage an obligation was assumed or imposed, and who has suffered actual money damages by another's breach of that obligation, should be fairly compensated for the loss thereby sustained.

*Id.* The award of interest is discretionary with the court and turns on considerations of practical justice and fairness rather than a rigid theory of compensation. *Bass*, 215 F.2d at 14, 15. It is not necessarily a bar to the allowance of interest that a claim has not been liquidated. *Id.* at 15. In approving an interest award by the Interstate Commerce Commission in *Louisville & Nashville Railroad Co. v. Sloss-Sheffield Steel & Iron Co.*, 269 U.S. 217, 240, 46 S.Ct. 73, 81, 70 L.Ed. 242 (1925), the Court said, "The mere fact that the validity of the claim is disputed and that the amount recoverable is uncertain obviously does not bar the recovery of interest." Nebraska's restrictive rules on liquidation do not control the availability of prejudgment interest under either the Interstate Com-

merce Act or the Packers and Stockyards Act.

One purpose of prejudgment interest is to "help[ ] compensate plaintiffs for the true cost of money damages they have incurred." *General Facilities v. National Marine Service, Inc.*, 664 F.2d 672, 673 (8th Cir.1981). "[E]quitably, particularly in these days of high interest rates, the wronged party should ordinarily collect prejudgment interest where the damages can be computed with reasonable precision." *Nebraska Public Power District v. Borg-Warner Corp.*, 621 F.2d 282, 287 n. 10 (8th Cir.1980). Courts interpreting the same statutory language at issue here— "shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of such violation," *compare* 7 U.S.C. § 209(a) *with* former 49 U.S.C. § 8 (repealed 1978))— have long approved of the Interstate Commerce Commission's policy of awarding interest on reparations orders from the date of exaction of excessive freight charges. *E.g., Louisville & Nashville Railroad Co. v. Sloss-Sheffield Steel & Iron Co.*, 269 U.S. 217, 46 S.Ct. 73, 70 L.Ed. 242 (1925); *Missouri Pacific Railway Co. v. C.E. Ferguson Sawmill Co.*, 235 F. 474 (8th Cir. 1916). In the present case, the Secretary awarded prejudgment interest at a 13 percent rate, apparently pursuant to a policy published at 45 Fed.Reg. 37872 (June 5, 1980) (changing the long-standing rate of 8 percent).

The award of prejudgment interest on at least some part of the reparations award pursuant to Department of Agriculture policy was legal. I shall address later the question of whether interest is appropriate on all of the award. The inquiry now turns to the claim for actual interest expenses.

■ The plaintiffs' second cause of action is based on evidence presented at trial that the Rowses wrote a check to the First National Bank of Atkinson, in reliance on the validity of the Kaba checks, to pay off part of their indebtedness to the bank; that the Rowses' account contained insufficient funds to cover their check to the bank once

it became known that Kaba's checks, which they had deposited in their account, had been dishonored; that the Rowses took out a new loan for $58,000 to replace the funds represented by Kaba's checks and to cover their check to the bank; that the replacement loan has been refinanced subsequently, but remains unpaid; and that the Rowses have incurred substantial interest expenses under the replacement loan at rates varying from 13¾ to 17½ percent. As of the date of trial, the unpaid balance of principal and interest was $117,067.75, and interest was accruing at the rate of $41.41 per day.

According to the administrative record, the facts concerning the making of the replacement loan and its amount were brought out on cross-examination of a bank officer during his deposition, but no evidence was elicited concerning the interest paid on that loan. The reparations complaint before the Secretary sought the amount of the net sales proceeds from the auction of the Rowse cattle "plus daily interest thereon from February 27, 1980, forward," but did not allege the existence of the replacement loan or seek damages for the interest incurred on that loan. The plaintiffs' briefs to the Secretary, filed approximately two years after the replacement loan was taken out, did not mention that loan or seek damages for interest actually paid as a result of the defendant's violation of the Act; instead, the only reference to interest was a plea in the summary of the reply brief for the net sales proceeds and the commission, "and with interest on this total amount at the rate of at least 12% from February 27, 1980, forward," without mentioning the authority for the 12 percent rate. The reparations order mentioned the execution of the promissory note to the Rowses' bank after Kaba's checks bounced, but made no mention of interest incurred on that loan. Instead, the Secretary, without explanation, included in the order an award of interest at the rate of 13 percent from April 1, 1980, until paid. The apparent basis of the interest award was 45 Fed.Reg. 37872 (June 5, 1980), rather than damages for actual interest expenses. Therefore, it is apparent that the issue of recovery of actual interest expenses as an item of damages for violation of the Act was not presented to the Secretary. Evidence of the amount of actual interest expenses and argument that they should be included in the measure of damages were first presented to this court.

The defendant argues that this court lacks jurisdiction to modify the reparations award by giving the plaintiffs additional relief, because the Secretary declined to grant actual interest damages by awarding interest at a flat rate instead and because the plaintiffs declined to seek judicial review under 5 U.S.C. §§ 702 and 703. As discussed above, I do not agree that the issue of actual interest was presented to the Secretary, although some of the evidence relevant to the claim came out in a different context. Nor do I agree that the court lacks subject matter jurisdiction to award more relief than was given by the Secretary. The Administrative Procedure Act is not an independent jurisdictional provision; rather, 28 U.S.C. § 1331, "subject only to preclusion-of-review statutes created or retained by Congress, [confers] jurisdiction on federal courts to review agency action." *Califano v. Sanders*, 430 U.S. 99, 105, 97 S.Ct. 980, 984, 51 L.Ed.2d 192 (1977). The procedure for review is provided by the Administrative Procedure Act, unless overridden by a more specific statute, but jurisdiction comes from the general statute granting district courts jurisdiction over federal questions.

■■■ The cases cited by the defendant are inapposite. *United States v. ICC*, 337 U.S. 426, 69 S.Ct. 1410, 93 L.Ed. 1451 (1949), merely applied the traditional election-of-remedies doctrine to the remedy section of the Interstate Commerce Act. The court restated what 49 U.S.C. § 9 said explicitly: although damages for a violation of the Act may be sought either by complaint to the ICC or by court action, if a remedy is pursued in one forum, a fresh action in the other forum is barred. However, the court pointed out that the election rule does not prevent a shipper whose ICC

complaint is denied from seeking court review of the denial under 28 U.S.C. § 1336. While there is no specific jurisdictional statute for review of denial of Packers and Stockyards Act complaints, none is necessary since the elimination of the $10,000 jurisdictional requirement from § 1331. In *Crain v. Blue Grass Stockyards Co.*, 399 F.2d 868 (6th Cir.1968), the court held that a plaintiff under who chose under 7 U.S.C. § 209(b) to seek a court remedy directly should have brought an administrative claim first because it was based on issues within the "primary jurisdiction" of the Secretary. In *United States v. Bass*, 215 F.2d 9 (8th Cir.1954), the court held that the district court could enforce an order of the Reconstruction Finance Corporation but could not modify it because a statute provided that only the Emergency Court of Appeals had jurisdiction to review such orders.

In the present case, the plaintiffs did go to the Secretary first and now are seeking to enforce the portion of the order in their favor and to modify it to add relief not sought from the agency. While it would have been preferable for the actual interest claim to have been presented to the Secretary in the reparations proceedings, on balance the interests of the government and the defendant are not weighty enough to require either remand of that portion of the claim or its dismissal on the basis of waiver. The actual interest claim is wholly dependent on the finding of an unjust practice, the same question underlying the relief granted by the Secretary. The underlying question certainly was one properly committed to initial determination by the agency as a matter within its primary jurisdiction. Interpretation of the Act and of the agency's own regulations are matters best addressed first by the agency because of its special knowledge and expertise in the area. However, the question of the proper remedy in a reparations proceeding does not invoke such special administrative expertise. Under 7 U.S.C. § 209 the defendant is liable for "the full amount of damages sustained in consequence of such violation." While setting standards for the just and reasonable rendering of stockyard services may be a matter committed to the agency's domain, determining questions of damages and causation has been a judicial function for centuries. Section 210(f) requires de novo judicial review of questions of law. While deference is due the Secretary on such mixed question of fact and law as whether the facts of the case show an "unjust practice," no such deference would be due on the mixed fact/law questions of causation and compensation. The review scheme contemplates that the court would take evidence to rebut or support the Secretary's factual findings; therefore, it is not necessary to give the agency a chance to develop the factual record on the actual interest issue.

Under the circumstances present here, I see no danger to the integrity of the agency's adjudicative process if these plaintiffs or others are allowed during the enforcement action in court to seek items of damage they did not seek at the agency level. There is no procedural advantage to sandbagging the claim. To the contrary, had the defendant chosen to pay the award rather than compel the plaintiffs to go to court to enforce it, the plaintiffs would have lost any opportunity to present the omitted claim later. The incentive is to present the entire case to the Secretary. Also, the defendant has pointed to no prejudice to its ability to defend against the actual interest claim as a result of the plaintiffs waiting (or forgetting) to bring it until now.

The remedy provisions of the Packers and Stockyards Act are significantly different from those of the National Labor Relations Act. The latter give the regulatory agency alone the power to hear complaints of unfair labor practices, to order a violator to cease and desist the practice, "and to take such affirmative action ... as will effectuate the policies of this subchapter." 29 U.S.C. § 160(c). Review from the board's order is to the court of appeals on the agency record, findings of the board are conclusive as to the facts, although the court may remand to the board for addi-

tional evidence, and the appellate court may not consider any objection that was not urged before the board. § 160(e). In light of this scheme, the Supreme Court has held that the court of appeals erred when it modified the board's cease-and-desist order by adding reimbursement of litigation expenses and excess organizational costs resulting from the defendant's illegal conduct, because the question of what remedies will best effectuate the purpose of the labor laws was committed by Congress to the board. *NLRB v. Food Store Employees Union*, 417 U.S. 1, 94 S.Ct. 2074, 40 L.Ed.2d 612 (1974). By contrast, the remedy provision involved here simply allows those injured by a violation to recover resulting damages as a remedy cumulative to, rather than in place of, existing common law or statutory remedies and gives concurrent jurisdiction to the Secretary and the district courts (subject to the judicial gloss of the primary jurisdiction doctrine). The Act is structured so that its purposes are furthered by compensation per se, rather than on a case-by-case discretionary basis. The court may award all compensation to which the plaintiffs are entitled even though a portion was not considered by the Secretary.

Therefore, the actual interest claim is properly before the court. The next question is whether the plaintiffs should be allowed actual interest damages rather than the flat rate allowed by the Secretary. This inquiry goes not to whether the Secretary made an error of law or acted arbitrarily, but to whether the plaintiffs have proven their second cause of action. If they are entitled to recover actual interest, the prejudgment interest component of the reparations order must fall as duplicative rather than as erroneous.

Much of what I have said about why a prejudgment interest award is proper for compensating victims of unjust stockyards practices also supports my conclusion that actual interest should be awarded when that provides a more accurate measure of the plaintiffs' losses. The Secretary's notice of a proposed increase from 8 to 13 percent in the prejudgment interest rate for reparation awards noted that the reason for the change was "to bring such rate more in line with current rates of interest." 45 Fed.Reg. 19590 (March 26, 1980). The purpose of prejudgment interest in general is to allow compensation more closely approximating the plaintiff's actual losses than would mere payment of the amount originally withheld. The Act itself calls for award of the plaintiff's "full amount of damages." Where the evidence of the actual amount of interest paid in consequence of the violation is available, that measure more accurately compensates the plaintiffs than does the flat rate of the agency's policy. " 'Where there is more than one method of estimating damages, that method which is most definite and certain should be adopted.... [T]hat one should be chosen which best achieves the fundamental purpose of compensation to the injured person for his loss ....' " *Big Rock Mountain Corp. v. Stearns-Roger Corp.*, 388 F.2d 165, 170 (8th Cir.1968).

Under 7 U.S.C. § 209(a), the plaintiffs are entitled to their full damages "sustained in consequence" of the violation. While principles of restitution might support allowing interest only on the portion of the net sales proceeds retained by the defendant, because the defendant has benefitted from retention of those funds, the purpose of compensation inherent in the statute supports allowance of interest on all of the net sales proceeds. It certainly was foreseeable to a man with Lenhart's experience in the cattle business that a rancher who parted with nearly $58,000 worth of cattle without being paid would have to borrow to cover the loss and would thereby incur interest expenses. The plaintiffs have adequately proven, through the testimony of Dean Rowse and Daniel Kramer, that the sole cause of the $58,000 loan in early April 1980 was to replace agricultural operating funds lost because of the failure of the defendant to pay out the proceeds of the sale according to the federal regulations.

However, interest is not recoverable on all $58,000. The net sales proceeds

that should have been paid to Kaba or the Rowses amounted to $57,184.33. The Secretary also required forfeiture of the commission, but this amount is more in the nature of a penalty for the violation of the Act than compensation for the plaintiffs' injuries. Had the defendant adhered to the regulations, the defendant would have been entitled to retain the commission and that amount would not have been available to the plaintiffs. Prejudgment interest generally is not available on penalties. *United States v. West Texas Cottonoil Co.*, 155 F.2d 463, 466–67 (5th Cir.1946). The amount of the loan over the amount of the sales proceeds cannot be said to have been caused by the defendant's violation.

 Therefore, the only portion of the award against which prejudgment interest could be charged as compensation for actual interest expenses is the amount of the net sales proceeds. The evidence is clear that no part of the $58,000 loan has been repaid and that no interest on the balance has been paid. That allows calculation of the amount of the interest properly attributable to the retention of the net sales proceeds. As of the date of trial, December 11, 1984, there had accrued $59,067.75 in interest on the full $58,000 principal. The proportion attributable to the $57,-184.33 net sales proceeds is $58,237.06. Since the trial, interest on the entire balance has been accruing at a rate of $41.41 per day. This converts to a rate of $40.83 attributable to the net sales proceeds. Though the forfeited commission of $692.80 should not draw interest before its forfeiture, the levy of interest against it at the rate set by agency policy, 13 percent, is appropriate from the date of the Secretary's order—from that point the interest is more akin to postjudgment interest, but the statutory rate of 28 U.S.C. § 1961 does not apply because the award was not by a district court. After the date of judgment, interest will accrue on the entire judgment at the rate set by 28 U.S.C. § 1961.

In summary, the damages consist of the following amounts:

—$57,184.33 in compensatory damages for failure to pay the net sales proceeds in accordance with regulations;

—$692.80 as forfeiture of the commission on the sale of the cattle;

—$58,237.06 in damages for actual interest expenses until the date of trial, December 11, 1984, plus $40.83 for each day from December 12, 1984 until the date of final judgment;

—Simple interest on the forfeited commission at the rate of 13 percent per annum from the date of the Secretary's order, February 3, 1984, until the date of final judgment.