McEvoy Travel Bureau, Inc. *vs.* Norton Company.

Worcester. September 6, 1990. - November 28, 1990.

Present: Liacos, C.J., Nolan, O'Connor, & Greaney, JJ.

*Fraud. Contract*, Termination. *Consumer Protection Act*, Availability of remedy, Damages, Attorney's fees. *Evidence*, Extrinsic affecting writing, Relevancy and materiality, Intent. *Practice, Civil*, Instructions to jury. *Damages*, Consumer protection case, Interest. *Interest.*

At the trial of a common law claim of fraud the jury were warranted in finding that the defendant induced the plaintiff to enter into a contract with it by misrepresenting that it had no intention to invoke a termination clause the defendant had unilaterally inserted in the contract; that the misrepresentations were not a part of the negotiations, but were made immediately prior to the signing of the contract; and that, in the circumstances, it was the defendant's fraudulent assurances, and not the contradictory written provisions of the contract, that constituted the parties' agreement. [709-713]

At the trial of a common law claim of fraud, the jury were warranted in finding that, in the context of the long-standing business relationship between the parties, the plaintiff was entitled to rely on the defendant's representation that it would not invoke a termination clause it had unilaterally inserted in the contract between the plaintiff and the defendant immediately prior to their signing it. [713-714]

A finding of intentional common law fraud was an appropriate basis for a multiple damages claim of unfair or deceptive practices under G. L. c. 93A, the Consumer Protection Act. [714]

At the trial of a claim of fraud, it was within the judge's discretion to conclude that the probative value of certain testimony, to the effect that the defendant might have acted illegally in other transactions, outweighed any possible prejudice. [714-715]

At the trial of a claim of fraud, it was within the judge's discretion to instruct the jury in terms of whether it was reasonable for the specific plaintiff to rely upon the defendant's representations in circumstances that the jury could have found operative. [715]

At the trial of a fraud claim arising from the defendant's termination of a contract with the plaintiff, the question of the parties' intent as to the duration of their contemplated "long-term arrangement" was properly referred to the jury's determination. [715-716]

A successful plaintiff on a claim under G. L. c. 93A was entitled to prejudgment interest only on its actual damages, and not on the noncompensatory multiple damages assessed under G. L. c. 93A, § 11. [716-719]

A successful plaintiff on a claim under G. L. c. 93A was entitled to its attorney's fees in connection with an appeal. [719-720]


CIVIL ACTION commenced in the Superior Court Department on October 28, 1983.

The case was tried before *Robert V. Mulkern*, J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Michael P. Angelini* for the defendant.

*Daniel F. Featherston, Jr.*, for the plaintiff.

*Donald N. Sweeney, George P. Field & Edgar J. Bellefontaine*, for John R. Schwanbeck, amicus curiae, submitted a brief.

GREANEY, J. McEvoy Travel Bureau, Inc. (McEvoy), brought this action against Norton Company (Norton) in the Superior Court alleging breach of contract, fraud, and unfair and deceptive trade practices in violation of G. L. c. 93A, §§ 2 (*a*) and 11 (1988 ed.). The breach of contract and fraud claims were tried to a jury which returned a verdict on the contract claim against Norton in the amount of $35,000, and a separate verdict on the fraud claim in the amount of $465,000.

Norton filed motions for judgment notwithstanding the verdicts, Mass. R. Civ. P. 50 (b), 365 Mass. 814 (1974), and, in the alternative, for a new trial, Mass. R. Civ. P. 59 (a), 365 Mass. 827 (1974). Norton's motion for judgment notwithstanding the verdicts was granted by the judge as to the breach of contract verdict and denied as to the fraud verdict.[1] (McEvoy has not appealed the judgment n.o.v. for Norton on the contract claim, and, consequently, that claim

---

[1]Norton had moved unsuccessfully for a directed verdict on both claims during the trial. See *Michnik-Zilberman* v. *Gordon's Liquor, Inc.*, 390 Mass. 6, 9 (1983).

is not before us.) On Norton's motion for new trial, the judge ordered a new trial unless McEvoy agreed to remit $165,000 of damages which the judge deemed excessive. McEvoy accepted the remittitur. The judge thereafter ruled in favor of McEvoy on its claim under G. L. c. 93A, doubling the damages, and indicating that McEvoy was to recover attorney's fees and costs. An amended judgment entered assessing $600,000 in damages (the reduced amount of $300,000 doubled), plus attorney's fees and costs.[2] The judgment computed prejudgment interest only on the base damages of $300,000. McEvoy moved pursuant to Mass. R. Civ. P. 59 (e), 365 Mass. 828 (1974), to alter or amend the judgment to have prejudgment interest computed on the entire $600,000. This motion was denied.

Norton has appealed, claiming that it was entitled to judgment as matter of law on the fraud claim because McEvoy's evidence failed to establish fraud. In connection with this argument, Norton contends that because the finding of liability under G. L. c. 93A was based exclusively on the jury's finding of fraud, it was entitled to judgment in its favor on the G. L. c. 93A claim. Norton also claims error in matters of evidence and in the jury instructions. McEvoy has cross-appealed, asserting that it was entitled to prejudgment interest on the full $600,000 in damages. We transferred the appeals to this court. We find no error in any of the points argued and, therefore, affirm the amended judgment.

Based on the evidence presented by McEvoy the jury could have found the following.[3] McEvoy was a small Worcester

---

[2]The amount of attorney's fees and costs, however, has not yet been determined.

[3]The legal quality of McEvoy's evidence on the fraud claim is to be assessed under the standard governing a motion for judgment notwithstanding the verdict. In such a case, "the judge's task, 'taking into account all the evidence in its aspect most favorable to the plaintiff, [is] to determine whether, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, the jury reasonably could return a verdict for the plaintiff.' *Tosti* v. *Ayik*, 394 Mass. 482, 494 (1985), quoting *Rubel* v. *Hayden, Harding & Buchanan, Inc.*, 15 Mass. App. Ct. 252, 254 (1983). The court will consider whether 'anywhere in the evi-

travel agency founded in the 1940's. For three decades prior to 1980, McEvoy provided air travel services to Norton, a large international conglomerate based in Worcester. During those three decades McEvoy and Norton never had a written contract or agreement of any kind. In the summer and fall of 1980, during a series of conferences with McEvoy, Norton proposed an arrangement whereby Norton would make McEvoy its exclusive travel agent for all of its Worcester area business. In return, McEvoy would make several commitments necessary to service the increased volume of business and share the commissions thereby derived. The parties agreed at this time that the arrangement would be a "long-term" contract. At no time during the negotiations was a written contract mentioned or envisioned.

All of the elements of the new arrangement were agreed upon by late November, 1980. McEvoy commenced performing its obligations under the agreement at that time. In particular, McEvoy, at considerable expense, moved its office to Norton's building, signed a five-year lease on that office, hired the necessary extra personnel, and purchased computer systems and other equipment necessary to handle all of Nor-

---

dence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn' in favor of the non-moving party. *Poirier* v. *Plymouth*, 374 Mass. 206, 212 (1978), quoting *Raunela* v. *Hertz Corp.*, 361 Mass. 341, 343 (1972). The inferences to be drawn from the evidence must be based on probabilities rather than possibilities and cannot be the result of mere speculation and conjecture. *Id.*" *McNamara* v. *Honeyman*, 406 Mass. 43, 45-46 (1989).

McEvoy suggests that we can bypass analysis of the issues pertaining to the fraud claim because the G. L. c. 93A judgment stands on its own and establishes liability entirely apart from the jury's verdict. Norton, on the other hand, maintains that the judge adopted the jury's verdict on the fraud claim and, as a result, that both the fraud and G. L. c. 93A findings are legally deficient. We cannot ascertain with clarity whether the G. L. c. 93A finding stands on its own. The judge made no independent findings of fact on the G. L. c. 93A claim. In his memorandum of decision, the judge stated that he "accept[ed] and endorse[d] the jury's findings that Norton made knowingly false representations," and predicated G. L. c. 93A liability thereon. In our view, the state of the record is such that proper decision of the appeals requires decision of the parties' contentions with respect to both the fraud and the G. L. c. 93A claims.

ton's business. In addition, McEvoy ceased its efforts to obtain other clients in order to devote more attention to its Norton account. McEvoy commenced full service of Norton's travel needs on January 1, 1981.

After McEvoy had been fully performing under the agreement for two months, Norton's director of corporate purchasing and transportation drafted a contract to memorialize the financial arrangements between the parties and sent it to McEvoy. In view of the lengthy dealings between the parties based exclusively on oral understandings, McEvoy was surprised by the contract and was particularly concerned that the contract contained a sixty-day termination clause. In addition, the contract had a term of one year, renewable at the end of 1981. McEvoy voiced its concerns at a meeting with Norton's representative in early March, 1981. Norton's representative reassured McEvoy that the parties in fact would continue to have a long-term arrangement and that the termination clause was "inoperative" and "meaningless," a mere technicality that Norton's law department had required. Based on these statements, McEvoy decided to sign the agreement a day or so after the meeting.

While these assurances were being given, Norton was exploring a different arrangement. Norton's representative anticipated that certain Federal regulations might change which would permit corporate travel customers a large share of travel agency commissions, then prohibited, and would make unnecessary (or less necessary) an exclusive servicing arrangement like McEvoy's. Without disclosures to McEvoy, Norton's representative, shortly before the signing of the contract, had circulated internal memoranda within Norton indicating that the arrangement with McEvoy was a "trial arrangement . . . for 1981," and further indicating that Norton should keep all its options open, including a so-called "in-house" option that could dispense with the need for McEvoy. In the meantime, the McEvoy arrangement would permit Norton's employees to learn the details of the travel business. As has been indicated, these secret purposes were not shared with McEvoy, which was told that it had a long-term deal

that would not be affected by the termination clause in the contract.

In 1982 and 1983, the parties executed two subsequent written contracts which were identical to the 1981 contract, except that the financial formula for profit sharing was different in each one. The termination clause was not discussed at the signing of either of the two subsequent contracts.

Prior to the signing of the 1983 contract, Norton advised McEvoy that it planned to explore the possibility of using a different travel agency if it could find one that offered better terms. During the first half of 1983, Norton entered into an arrangement with another travel agency. In May, Norton exercised the sixty-day termination provision of the 1983 contract, thereby ending its lengthy relationship with McEvoy.

1. The basis of McEvoy's common law claim against Norton is that Norton fraudulently induced McEvoy to sign the written contract by misrepresenting its intentions. McEvoy contended that by declaring that the termination provisions were "meaningless" or "inoperative," and that the longstanding arrangement which had existed between the parties would continue in full force, Norton, in effect, had represented that it harbored no intention of invoking the termination provision. The jury agreed and found that Norton had made false representations because Norton did, in fact, actually intend to invoke the termination provision.

Massachusetts law clearly states that statements of present intention as to future conduct may be the basis for a fraud action if, as the jury could have found to be the case here, the statements misrepresent the actual intention of the speaker and were relied upon by the recipient to his damage.[4] *Barrett Assocs., Inc.* v. *Aronson*, 346 Mass. 150, 152

---

[4]The evidence, principally in the form of internal memoranda of Norton, which disclosed that Norton did not want to bind itself to a long-term arrangement with McEvoy, permitted the jury to find that the actual intentions of Norton's representative were very different from the statements made to McEvoy to induce the signing of the contract, and that Norton harbored the secret purpose of using McEvoy only until it could find a cheaper way of doing business.

(1963). *Feldman* v. *Witmark*, 254 Mass. 480, 481-482 (1926). See also Restatement (Second) of Torts § 530 (1977).

Norton cites *Turner* v. *Johnson & Johnson*, 809 F.2d 90 (1st Cir. 1986), in support of the contention that a fraud claim cannot be based upon the oral misrepresentations alleged by McEvoy because those statements contradict a specific and unambiguous provision of a written contract. *Turner* involved the sale by the plaintiffs of an electric thermometer business to Johnson & Johnson in return for cash consideration and a portion of the royalties. There were extensive negotiations during a period of six months, and the parties exchanged several versions of a written contract. *Id.* at 93. At one point during the negotiations, Johnson & Johnson represented to the plaintiffs, among other things, that it would promote the sale of the thermometer, offer it to customers, and educate health care professionals on how to use it. The final version of the written contract, however, stated that Johnson & Johnson was not obligated to use its best efforts to market the thermometer.

When Johnson & Johnson failed to market the thermometer, the plaintiffs sued, alleging common law fraud. The United States Court of Appeals for the First Circuit reversed a judgment based on a jury verdict in favor of the plaintiffs. The court held that "where both parties were experienced in business and the contract was fully negotiated and voluntarily signed, plaintiffs may not raise as fraudulent any prior oral assertion inconsistent with a contract provision that specifically addressed the particular point at issue." *Id.* at 97.

*Turner* is distinguishable from this case in at least two important respects. First, in *Turner*, the alleged fraud took place during negotiations prior to the signing of the contract. Because of this, the *Turner* court was concerned that representations made during the "give-and-take of negotiations," before any final commitment or agreement is made, might be raised to contradict what is finally and unequivocally agreed upon in the final version of the contract. As the court stated,

in such circumstances, "the language of a contract simply would not matter anymore." *Id.* at 96.

This threat to contractual certainty does not exist where, as could be found by the jury here, the misrepresentations were not part of the negotiations but were made immediately prior to the signing of the initial contract.[5] Unlike this case, there was no allegation in *Turner* that Johnson & Johnson, in order to induce the plaintiffs to sign, pointed to a particular provision of the final contract and fraudulently promised that it would not invoke the provision. Indeed, the *Turner* court intimated that when fraudulent representations that contradict the writing are made at closing and induce the other party to sign, they may be the basis for a common law fraud action. *Id.* at 98-99.[6]

Second, *Turner* rested largely on its finding that the written contract represented the parties' complete and final understanding. The contract was fully negotiated, and several written versions had been exchanged by the parties before the final document was executed. The situation in *Turner* thus paralleled to a considerable extent what had occurred in *Plumer* v. *Luce*, 310 Mass. 789 (1942), where a plaintiff with considerable business intelligence signed a contract that was clearly at variance with the defendant's prior statements after indicating that she (the plaintiff) understood the contract "fully," including a provision therein that the plaintiff

---

[5]There is no merit to Norton's argument that the parol evidence rule barred evidence of the misrepresentations. It is well established that the parol evidence rule does not apply when the complaining party alleges fraud in the inducement. See *Broomfield* v. *Kosow*, 349 Mass. 749, 759 (1965); *Kilkus* v. *Shakman*, 254 Mass. 274, 279 (1926). See also Restatement (Second) of Contracts § 214 (1981).

[6]Similarly, the Massachusetts case upon which *Turner* heavily relies, *Plumer* v. *Luce*, 310 Mass. 789 (1942), did not involve a fraudulent inducement to sign. As this court stated in *Plumer*: "The agreement that [the plaintiff] signed may not read very much like what she says the proposed arrangement was, but where, as here, it is not open to her to contend that she was induced to sign the agreement by fraud, we are of opinion that she cannot rightly contend that one of the terms of a proposed agreement that never came into existence can be used as a basis upon which to bring [a fraud action]." *Id.* at 805.

did not rely upon anything not expressly stated in the contract. By contrast, the jury could have found in this case that the termination provision in the Norton-McEvoy contract was not mentioned during negotiations but rather had been inserted unilaterally by Norton. The jury also could have found that the only discussion on the subject consisted of McEvoy protesting, and Norton fraudulently assuring McEvoy that it did not intend to invoke the provision but intended to continue the parties' long-standing prior association. The written contract in this case, therefore, could be found not to represent the parties' complete understanding. The jury reasonably could have concluded that it was McEvoy's acceptance of Norton's fraudulent assurances that constituted their agreement on the issue, and not the contradictory written provision in the contract.[7]

Having pointed out these distinctions between *Turner* and this case, we add that it has never been necessary under Massachusetts law in order to establish fraud in the circumstances like those found by the jury to prove that the fraud was committed at the precise time the contract was signed. Liability may be imposed if "[a]t the time of the execution of the contract [the] misrepresentation was still operative, even if the fraud took place prior to the contract's execution." *Broomfield* v. *Kosow*, 349 Mass. 749, 758-759 (1965). As the *Broomfield* decision points out at 759, the leading case of *Bates* v. *Southgate*, 308 Mass. 170, 182 (1941), specifically rejects a defense based on the timing of the fraud.

We continue to believe that parties to contracts, whether experienced in business or not, should deal with each other honestly, and that a party should not be permitted to engage

---

[7]In describing a case almost identical to this one, Corbin states: "When parties . . . sign a document and include in it a provision as to termination by notice, at the same time expressly stating that the provision is a mere 'face-saving device' never to be effective, they have not adopted that document as a 'complete and accurate integration' of their agreement. Instead they have [in Williston's words] issued it 'in usual form, but limited its terms by parol agreement.' " 3 Corbin on Contracts § 582, at 463 (1960). See also 9 J. Wigmore, Evidence § 2435, at 118 and § 2439, at 128 (1981).

in fraud to induce the contract. *Bates* v. *Southgate, supra,* states the strong public policy that supports this principle. See Restatement (Second) of Contracts § 164 (1981). "In obedience to the demands of a larger public policy the law long ago abandoned the position that a contract must be held sacred regardless of the fraud of one of the parties in procuring it." *Bates* v. *Southgate, supra* at 182. See *Broomfield* v. *Kosow, supra*; *Sandler* v. *Elliott,* 335 Mass. 576 (1957). In this case, the jury determined that harm and injustice would result from Norton's fraud unless McEvoy was allowed to recover. Cases like this one are to be analyzed in light of the principles stated in *Bates, supra,* while cases, generally similar to *Turner,* where there can be no reasonable reliance on the alleged misrepresentation, are to be analyzed under the principles stated in *Plumer* v. *Luce, supra.* We therefore see no reason to create, as *Turner* suggests, a new rule or an exception to fit cases between sophisticated business enterprises involving contracts which have been induced by the fraud of a party.

Finally, we reject Norton's contention that it was not reasonable for McEvoy to rely upon Norton's fraudulent misrepresentations. Indeed, it is unreasonable to impose a rule that a party to any contract must assume that deceit is at work when the other party makes representations of intentions with respect to a written contract provision. It would have been virtually impossible for McEvoy to verify, through investigation or otherwise, whether Norton's intentions were truly what it said they were, but even if it were possible, McEvoy would be under no duty to do so. "Certainly where a defendant has wilfully made false representations with intent to deceive he ought not to be relieved of liability because of his victim's lack of diligence." *Yorke* v. *Taylor,* 332 Mass. 368, 373 (1955). See *Kannavos* v. *Annino,* 356 Mass. 42, 50 (1969). In view of the long existing relationship between the parties, and the commitment McEvoy was making to the expanded venture, the jury could find that McEvoy was entitled to take Norton's statements at face value and credit them. The communications prior to the signing of the third con-

tract about Norton's possible use of another travel agency could be found by the jury as occurring after significant reliance had been effected.

2. Because the fraud judgment is tenable in fact and law, it follows, contrary to Norton's argument, that there was no error in the judge's finding that Norton had violated G. L. c. 93A, §§ 2 (*a*) and 11. Common law fraud can be the basis for a claim of unfair or deceptive practices under the statute, see *PMP Assocs., Inc.* v. *Globe Newspaper Co.*, 366 Mass. 593, 596 (1975); *Levings* v. *Forbes & Wallace, Inc.*, 8 Mass. App. Ct. 498, 504 (1979), and an intentional fraud can constitute a basis for the multiplication of damages.

3. Norton's remaining arguments on the fraud verdict are not substantial.

(a) Norton claims that it was error for the judge to admit certain testimony that was irrelevant and prejudicial. At different points during the trial, there was testimony as to the possible illegality of certain arrangements that Norton had made with another travel company in 1983 in order to obtain international rebates. Norton contends that the introduction of this evidence allowed the jury to make the impermissible inference that, because Norton might have acted illegally in obtaining the international rebates, it must have defrauded McEvoy.

The evidence was admitted by the judge based on McEvoy's argument that it could tend to show a motive or reason for Norton's rejection of the parties' arrangement. See P.J. Liacos, Handbook of Massachusetts Evidence 421 (5th ed. 1981). Specifically, McEvoy maintained that Norton broke off the arrangement because McEvoy would not engage in these more profitable, but possibly illegal, arrangements, while the other travel company would. It was within the judge's discretion to decide, as he did, that the probative value of the evidence outweighed any possible prejudice.[8]

---

[8]Norton's contention that it was error for the judge to exclude Norton's contract with the other company from evidence and, at the same time, admit evidence as to the possible illegality of international rebates, is not serious. The judge did admit the other company's proposals to Norton con-

*Tosti* v. *Ayik,* 394 Mass. 482, 490 (1985). There was no error.

(b) Norton contends that the judge committed error by instructing the jury that the standard for reliance was whether it was reasonable for McEvoy to rely on Norton's representations, rather than whether it would have been reasonable for experienced business people so to rely.

A trial judge has considerable discretion in giving the applicable law to the jury, and the judge is under no obligation to charge the jury in the specific language requested by a party. *Corsetti* v. *Stone Co.,* 396 Mass. 1, 14-15 (1985). The judge in this case may have determined that, because of the evidence of the parties' long-term relationship and of the trust that had developed between them over the decades, it would not be proper for the jury to assess their conduct by the standards of experienced business people dealing with each other at arm's length. Alternatively, the judge may have determined that the instructions he gave encompassed the instruction requested by Norton. He did not, as Norton claims, set forth a naked "reasonableness" standard, but asked whether it was reasonable for a specific party, Mc-Evoy, to rely on Norton's representations in the circumstances that could have been found operative by the jury. See *Jacobs* v. *Pine Manor College,* 399 Mass. 411, 414 (1987). It was within the judge's discretion to instruct the jury as he did. See *Julian* v. *Randazzo,* 380 Mass. 391, 397 (1980).

(c) Norton contends that the question of the meaning of "long-term arrangement" was improperly submitted to the jury. Specifically, Norton claims that because an essentially vague and ambiguous term was defined by McEvoy's expert witness as being two to three years in duration and because there is no evidence as to the parties' intent, the expert's testimony should have been considered binding. Norton urges that the jury should not have been allowed to consider the meaning of the term any further. We disagree.

---

cerning the international rebate arrangement, overruling Norton's objections. The inconsistency, if any, of the rulings is insignificant.

There was other evidence as to the parties' intent respecting the duration of a "long-term arrangement." The jury permissibly could have looked at the factors included in the arrangement that had been made, for example, the fact that McEvoy had signed a five-year lease on its office in Norton's building in reliance on the arrangement, and discontinued business with other clients, or the understandings that the parties had had under earlier arrangements. Furthermore, the expert's testimony was far from clear. "Where the evidence is disputed as to the terms or performance of an oral agreement, or the meaning of the words used by the parties, the matter should be left to the jury." *Green* v. *Richmond,* 369 Mass. 47, 53 (1975). See *Goldstein* v. *Katz,* 325 Mass. 428, 430 (1950). The question was properly referred by the judge to the jury's determination. The jury's apparent construction of the term was within the scope of the evidence before them, and the damages based thereon (as remitted) cannot be said to be speculative or unreasonable. See *Mirageas* v. *Massachusetts Bay Transp. Auth.,* 391 Mass. 815, 822 (1984).

4. In the cross-appeal, McEvoy disputes the judge's failure to direct the addition of prejudgment interest to the multiple damages assessed under G. L. c. 93A. In *Makino, U.S.A., Inc.* v. *Metlife Capital Credit Corp.,* 25 Mass. App. Ct. 302, 320-322 (1988), the Appeals Court held that prejudgment interest is not to be added to multiple damages imposed under G. L. c. 93A. McEvoy urges that we reject the *Makino* decision and conclude that it was entitled to prejudgment interest on the entire $600,000. We are satisfied that the rule in *Makino* is the correct one.

General Laws c. 231, § 6B (1988 ed.), which was the interest statute applied in this case, provides that the prevailing party is to recover prejudgment interest from the date of the commencement of the action even if the interest brings the amount assessed beyond the maximum liability imposed by law. This statute existed long before the enactment of G. L. c. 93A, and it has not been modified in any respect expressly to encompass the concept of multiple damages made possible

by G. L. c. 93A. The latter statute in turn makes no provision for interest on any multiple damages assessed thereunder. General Laws c. 231, § 6B, and G. L. c. 93A are to be construed to promote their common objectives. See *Board of Educ.* v. *Assessor of Worcester*, 368 Mass. 511, 513-514 (1975).

The purpose of prejudgment interest under G. L. c. 231, § 6B, is "to compensate a damaged party for the loss of use or the unlawful detention of money." *Conway* v. *Electro Switch Corp.*, 402 Mass. 385, 390 (1988). See *Mirageas* v. *Massachusetts Bay Transp. Auth.*, *supra* at 821; *Bernier* v. *Boston Edison Co.*, 380 Mass. 372, 388 (1980); *Makino, U.S.A.* v. *Metlife Capital Credit Corp.*, *supra* at 320-321. The damaged party is entitled to a return on the money that the party would have had but for the other party's wrongdoing. To give the damaged party more than that would go beyond the purpose of the statute. The purpose behind the prejudgment interest statute is not to penalize the wrongdoer, *Mirageas* v. *Massachusetts Bay Transp. Auth.*, *supra* at 821, or to make the damaged party more than whole.

On the other hand, the multiple damages provisions of G. L. c. 93A are essentially punitive in nature. "The multiple damage provisions of c. 93A are designed to impose a penalty . . . that varies with the culpability of the defendant" (citation omitted). *International Fidelity Ins. Co.* v. *Wilson*, 387 Mass. 841, 856 (1983). See *Linthicum* v. *Archambault*, 379 Mass. 381, 388 (1979); *Heller* v. *Silverbranch Constr. Corp.*, 376 Mass. 621, 627-628 (1978). To add prejudgment interest to these penal damages would compound the penalty and would violate the purpose of G. L. c. 231, § 6B.[9]

---

[9]McEvoy's attempt to distinguish between multiple damages and punitive damages, even if valid, does not bear on our holding. To the extent that both are noncompensatory in nature, the prejudgment interest statute does not apply.

Reference has also been made to G. L. c. 231, § 6H (1988 ed.), which involves prejudgment interest in cases not otherwise covered. The analysis above applies to any considerations under § 6H that might be argued here.

Further, G. L. c. 93A, § 11, speaks in terms of a successful plaintiff's recovery of "actual damages," which, in appropriate circumstances, may be multiplied. "Generally, 'actual damages' are losses flowing directly from a wrongful act," *Simon* v. *Solomon*, 385 Mass. 91, 112 (1982), which in this case are McEvoy's economic losses. The language of G. L. c. 231, § 6B, applies to the payment of prejudgment interest on the actual damages contained in the verdict, and the statute's language reasonably cannot be stretched to encompass noncompensatory multiple damages. Indeed, in connection with another multiple damages statute, G. L. c. 231, § 85J (1988 ed.), we implicitly have accepted the principles stated in the *Makino* decision on prejudgment interest by noting that "[w]e agree with the defendant that interest on the multiple damages portion of the § 85J damages award runs only from the date of judgment. See *Makino, U.S.A., Inc.* v. *Met-life Capital Credit Corp.*, 25 Mass. App. Ct. 302, 320-321 (1988)." *Briggs* v. *Carol Cars, Inc.*, 407 Mass. 391, 396 n.2 (1990).

The other arguments made on this issue are not persuasive.

(a) We reject McEvoy's strained reading of the "judgment" to be multiplied in the recently amended version of G. L. c. 93A, § 11, as including prejudgment interest.[10] This amendment to the fifth paragraph of § 11 simply cannot be read as requiring prejudgment interest on multiple damages.

(b) While McEvoy cites three cases from other jurisdictions where prejudgment interest was held to be applicable to

---

[10]Section 2 of c. 580 of the Acts of 1989 amended G. L. c. 93A, § 11, as follows:

"The fifth paragraph of section 11 of said chapter 93A, as so appearing, is hereby amended by inserting after the first sentence the following sentence: — For the purpose of this chapter, the amount of actual damages to be multiplied by the court shall be the amount of the judgment on all claims arising out of the same and underlying transaction or occurrence regardless of the existence or nonexistence of insurance coverage available in payment of the claim."

multiple damages,[11] "the preponderant weight of authority among courts which have considered the question," *Makino, U.S.A.* v. *Metlife Capital Credit Corp.*, *supra* at 321, supports our view.[12]

(c) Finally, we do not believe that a failure to award the prejudgment interest sought by McEvoy will have an adverse effect on promoting the prompt settlement of valid G. L. c. 93A claims. There is enough force in the possibility of penalty damages under the statute to compel a culpable party to think seriously of settlement without misapplying G. L. c. 231, § 6B, as a further stimulus.

5. McEvoy has requested an award of attorney's fees in connection with the appeal. It is entitled to such an award. See *Yorke Management* v. *Castro*, 406 Mass. 17 (1989). The matter of that award is to proceed in accordance with the

---

[11]See *Bass* v. *Spitz*, 522 F. Supp. 1343 (E.D. Mich. 1981); *Lauder* v. *Peck*, 11 Conn. App. 161, 167-168 (1987); *Midland-Guardian Co.* v. *United Consumers Club, Inc.*, 499 N.E.2d 792, 800 (Ind. Ct. App. 1986). The fourth case cited by McEvoy, *Dorsett Carpet Mills, Inc.* v. *Whitt Tile & Marble Distrib. Co.*, 734 S.W.2d 322 (Tenn. 1987), did not reach the issue.

[12]To supplement the list of courts cited in *Makino* that have held that prejudgment interest does not apply to penal or punitive damages, we note the following decisions: *Rayonier, Inc.* v. *Polson*, 400 F.2d 909, 922 (9th Cir. 1968) (construing Washington statute); *Rowse* v. *Platte Valley Livestock, Inc.*, 604 F. Supp. 1463, 1473-1474 (D. Neb. 1985) (construing Federal statute); *Wirig* v. *Kinney Shoe Corp.*, 448 N.W.2d 526, 535 (Minn. Ct. App. 1989); *Poling* v. *Wisconsin Physicians Serv.*, 120 Wis. 2d 603, 611 (Ct. App. 1984). We are aware of the fact that these decisions may turn on the particular language of the statute involved or common law principles that differ somewhat from Massachusetts law. The decisions nevertheless bespeak a policy that we think is relevant. That policy rejects the idea of prejudgment interest on multiple damages.

McEvoy cites several cases decided in this court, and in the Appeals Court, which appear to have allowed prejudgment interest on G. L. c. 93A multiple damages. The issue before us and the *Makino* court was not raised in any of the cases, however. "The most that can be said is that the point was in the cases if anyone had seen fit to raise it. Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *Webster* v. *Fall*, 266 U.S. 507, 511 (1925). See also *Kneeland* v. *Emerton*, 280 Mass. 371, 388 (1932). These decisions obviously do not control.

directions stated in the *Yorke Management* decision, *supra* at 20.

The amended judgment is affirmed.

*So ordered.*